```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF COLORADO

 3   Criminal Action No. 22-cr-0313-RM

 4

 5    UNITED STATES OF AMERICA,

 6            Plaintiff,

 7            vs.

 8    JAREH SEBASTIAN DALKE,

 9            Defendant.

10   -------------------------------------------------------------

11                       REPORTER'S TRANSCRIPT
                               Sentencing
12   -------------------------------------------------------------

13
         Proceedings before the HONORABLE RAYMOND P. MOORE, Senior
14     Judge, United States District Court for the District of
       Colorado, commencing on the 29th day of April, 2024, in
15   Courtroom A-601, United States Courthouse, Denver, Colorado.

16                            APPEARANCES

17   For the Plaintiff:
     JULIA K. MARTINEZ and JENA R. NEUSCHELER, U.S. Attorney's
18   Office, 1801 California St., Ste. 1600, Denver, CO 80202

19   ADAM L. SMALL, U.S. Department of Justice, National Security
     Division, Counterintelligence and Export Control Section, 950
20   Pennsylvania Ave, N.W., Washington, DC 20530

21   For the Defendant:
     DAVID A. KRAUT and TIMOTHY O'HARA, Federal Public Defender's
22   Office, 633 17th St., Ste. 1000, Denver, CO 80202

23

24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                  Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                transcription produced via computer.
```

```
22-cr-0313-RM          Sentencing          04/29/2024   2
```

1              *        *        *        *        *

2       (The proceedings commenced at 11:44 a.m.)

3            THE COURT:  We are here in this matter which is

4    22-cr-313, United States vs. Jareh Sebastian Dalke.  We're

5    here for a sentencing.  This is the unclassified portion of

6    the sentencing hearing.

7            Take appearances.

8            MS. MARTINEZ:  Good morning again, Your Honor.  Julia

9    Martinez, Jena Neuscheler, and Adam Small on behalf of the

10   United States.  We're joined at counsel table by the two case

11   agents on the case, FBI Special Agent Barbara Kelleher and

12   Nick Napoli.

13           THE COURT:  Good morning to all of you.

14           MR. KRAUT:  Good morning, Your Honor.  David Kraut

15   and Timothy O'Hara for Mr. Dalke.  Mr. Dalke appears in

16   custody at counsel table today.  And we are joined by our

17   investigator Amanda Carroll.

18           THE COURT:  Good morning to all of you as well.  As I

19   said, we're here today for sentencing following the earlier

20   pleas of guilty to six counts, I believe, of attempt to

21   transfer national defense information to an officer or agent

22   of a foreign government.  At this point I formally accept the

23   plea agreement pursuant to which the plea of guilty was made

24   back in October.  Realizing the answer, but for the sake of

25   the record, I ask you, Mr. Kraut, have you received a copy of

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM              Sentencing              04/29/2024    3

1    the presentence investigation report and the addenda and had

2    sufficient time to review those materials and to discuss them

3    with your client?

4              MR. KRAUT:  Yes to all questions, Your Honor.

5              THE COURT:  Same true for the Government,

6    Ms. Martinez?

7              MS. MARTINEZ:  Yes, Your Honor.

8              THE COURT:  In terms of objections -- well, let's

9    deal with what's been filed.  There have been various

10   classified filings, and I won't recount those on the record,

11   nor will I discuss them.  But beyond that, in terms of what

12   the Government has filed in connection with this sentencing of

13   a nonclassified nature, the Government has filed the motion

14   for the third point of acceptance of responsibility as ECF

15   No. 56.  That motion is granted.

16             The Government has also filed a motion for downward

17   departure from the guideline range.  I'll put a pin in it, and

18   the reason I say that is there's an objection that needs to be

19   resolved that the outcome of which impacts what happens with

20   that Government motion.

21             The Government also filed responses to various things

22   that the defendant has filed, meaning responses to the

23   objections to the presentence report, responses to the

24   defendant's motion for a downward variance as well.

25             There's also a motion for a preliminary order of

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    4

1   forfeiture that has been filed for a personal money judgment

2   and firearm.  I granted that already and assume that there's

3   no objection to that, as well as to the inclusion of such

4   things in the final judgment; is that correct, Mr. Kraut?

5            MR. KRAUT:  That's correct.

6            THE COURT:  And then in terms of what you have filed,

7   sir, you have filed objections and responses to the

8   presentence report and a motion for downward variance and then

9   a response to the Government's position with regard to

10  sentencing.  Did I miss anything that the Government has

11  filed?

12           MS. MARTINEZ:  No, Your Honor.

13           MR. KRAUT:  No, Your Honor.

14           THE COURT:  All right.  So let's turn to the

15  objections that have been -- the objections and clarifications

16  that have been filed by the defendant.  They fall into two

17  categories.  One is a category of matters that do not affect

18  the guideline range, and those are matters of clarification to

19  me.  Things like the fact that Mr. Dalke has not participated

20  in educational programming while he's been held in custody is

21  because he's in the special housing unit due to the nature of

22  the offense and as a consequence is not free, if you would, to

23  engage in such things.  And there's some other matters that

24  are also included here that are all listed.

25           I accept the clarifications that have been made.  I

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing          04/29/2024    5

1    think most of them have made their way into the final

2    presentence investigation report.  To the extent that they

3    didn't, I'll accept clarification such as they are.

4              Anything else you need from me with regard to that?

5              MR. KRAUT:  No further record on those matters.

6              THE COURT:  My understanding from the Government is

7    you're not quarrelling with any of that one way or the other.

8              MS. MARTINEZ:  That's correct, Your Honor.

9              THE COURT:  All right.  Then there is the objection,

10   and the objection is to the matter that I said at the time of

11   the change of plea I expected to be the objection, and it, in

12   fact, is, and that is whether or not abuse of position of

13   trust applies.  It is difficult in these context -- in this

14   context to say things because I'm aware of the fact that there

15   is people here.  I'm also aware of the fact that the people

16   here have no understanding of these guidelines and that this

17   sounds like a bunch of jibber-jabber.  It is what it is.  But

18   by the law I have to calculate the guidelines correctly and

19   then consider them, and then we get to the point where I can

20   impose sentence, so we need to talk about this.

21             Abuse of position of trust or use of a special skill

22   is 3B1.3.  I'm going to oversimplify the position.  The

23   position of the defendant is that he objects to the probation

24   office's inclusion of the two-point adjustment for that, and

25   he objects because in his view there is not an abuse of a

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    6

1    position of trust, nor is there the use of a special skill.

2          Insofar as abuse of a position of trust is concerned,

3    it seems counterintuitive, because obviously he had a

4    classified security clearance, and obviously there's a great

5    deal of trust that goes along with that.  But the circuit law

6    and, frankly, the application note itself is clear, seemingly,

7    that it's a bit of a misnomer in that the adjustment should be

8    applied where one is in a position, more of a supervisory

9    position, more of a position where there is a great deal of

10   discretion afforded to you.  That's the kind of trust that

11   it's speaking to.  And the argument is he worked at the NSA

12   for about a month and simply did not have that type of

13   position within that agency.

14          The Government's response is two-fold -- well,

15   disagrees and believes that there is both an abuse of a

16   position of trust and a use of a special skill.  I'll give you

17   each two minutes and no more than that to speak to this, and

18   then I'll rule.  I will tell you that to the extent that the

19   Government's view is that the Tenth Circuit case law that has

20   been developed up to now has been developed in the context of

21   fraud cases, and that it's not been developed in connection

22   with an espionage case, that is true, but I'm not convinced

23   that it is at all meaningful.

24          And the reason I say that is the guideline has -- the

25   guidelines have largely a meaning, and that meaning doesn't

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM             Sentencing            04/29/2024    7

1   really change from type of case to type of case.  That being

2   said, there is some older Tenth Circuit law that's still there

3   with respect to law enforcement activity that if you ask me to

4   analytically make compatible with the more recent statements

5   about supervision and discretion, I have a hard time doing it.

6   Where we are is where we are.

7          Mr. Kraut -- or -- I'm going to come to you always,

8   Mr. Kraut.  If you want to pass the puck to Mr. O'Hara at any

9   point, obviously you're free to do so.  The Government has a

10  larger number of persons who can take its baton, but,

11  Ms. Martinez, I will come to you in all instances as well.

12         MR. KRAUT:  Thank you very much, Your Honor.  I'll do

13  my best to address both aspects of this potential enhancement

14  in that short time.  On position of trust, the cases that the

15  Government cited in their reply to our PSR objections we

16  believe can and should all be distinguished from this case.

17  Very quickly, the *Ford* case from the Fourth Circuit in 2008,

18  Mr. Ford worked for the NSA for about two and half years.  He

19  took home top secret information on his last day there, and

20  was convicted at trial of --

21         THE COURT:  Look, there's a number of cases that --

22  not a large number, but there's a number of cases that involve

23  similar circumstances to what's before us in terms of

24  classified information cases.  I will tell you that they are

25  not binding, number one, because they're not from the Tenth

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024      8

1   Circuit; but, number two, it's almost adjustment by

2   declaration.

3          And what I mean by that is these cases will say,

4   well, obviously he was in a position of trust because he

5   wouldn't have been able to commit the offense without it.

6   It's true.  Obviously he's in a position of trust.  The same

7   is true for Mr. Dalke.  The question is whether he's obviously

8   in a position of trust as that term is used in the guidelines,

9   and to simply announce it without trying to explain, frankly,

10  the application note which says it means this, not that, is

11  not moving to me.

12         MR. KRAUT:  Thank you, Your Honor.  That's just what

13  I was going to say about the Fourth Circuit's analysis in the

14  *Ford* case, and it applies to really all the cases the

15  Government cited.  The Fourth Circuit did not analyze the

16  question of managerial discretion or oversight or lack thereof

17  in its opinion in the *Ford* case.  The same is true in the

18  *Pitts* case, and if we dig into the facts of that case,

19  Mr. Pitts had much more discretion in the course of his

20  career, worked as an FBI agent for over 13 years and was

21  committing espionage for approximately six of those years.

22  Then he was promoted several times.  Just the job titles alone

23  listed in that opinion indicate a significant --

24         THE COURT:  The only case you really need to talk to

25  me about is *Williamson*, 1995.

Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    9
```

1      MR. KRAUT:  And the *Williamson* case I do not have in

2  front of me.

3      THE COURT:  It's the police officer's case where the

4  circuit said --

5      MR. KRAUT:  They're inherently occupied positions of

6  public trust by taking the oath to uphold the law.

7      THE COURT:  Well, it's actually kind of tricky,

8  because what they -- what it says, and there are other cases

9  that are in this area that say the same thing, is that clearly

10  there's a public trust, and then the question is they don't

11  stop there, because if it was that abuse of trust, end of

12  discussion, we don't need to talk about anything else.  They

13  go on and create this additional hybrid, if you would, by

14  saying because of that, if you use any special knowledge,

15  access, or both, then you have to receive this adjustment.

16  And whatever I might think about that analytical or academic

17  debate, were we having it in a classroom, I don't get to

18  contradict the teacher.

19      MR. KRAUT:  My response to that analysis from '95 in

20  the Tenth Circuit is that the Court should look closely at the

21  *Spear* case from 2007.  The facts are different.  She wasn't a

22  law enforcement officer.  Ms. Spear was essentially an

23  assistant in the immigration services bureau in Denver.  But

24  in analyzing the issue, the Tenth Circuit made clear that the

25  Court needs to conduct a functional analysis of job

22-cr-0313-RM          Sentencing          04/29/2024   10

1    responsibilities when faced with this question, and it didn't

2    endorse or adopt the hybrid approach that *Williamson* sort of

3    implies that may apply when you're dealing with law

4    enforcement.

5          It just said the language of the guidelines itself

6    and the language of the application note require a very

7    detailed analysis of the job responsibilities.  In that case

8    it was relatively simple because Ms. Spear's job did not give

9    her the authority to engage in case-by-case decision-making or

10   set policies for INS or grant exceptions to governing

11   policies, and so the Court found her job did not qualify as a

12   position of trust despite the fact that she had access to

13   application fees and other revenue for INS and abused that

14   access.

15         So I think in 1995 we have this case from the Tenth

16   Circuit indicating, yes, perhaps law enforcement needs to be

17   treated differently, and the action of just taking their oath

18   and entering into that position may be enough to start the

19   next step of the analysis, did they abuse that position?

20   *Spear* I think takes a step in the other direction saying, no,

21   we have to look much more closely at the application note and

22   the functional -- the job functions themselves.

23         Turning to special skill in this case, the Government

24   essentially argues that -- well, first they raise three

25   comparison cases, each of which I think can and should be

22-cr-0313-RM          Sentencing          04/29/2024    11

1    distinguished.  The first is the *Campa* case, C-a-m-p-a.

2    Mr. Guerrero is the defendant within the *Campa* case that

3    they're referring to.  This was the multiple Cuban

4    intelligence agents that were all charged in one case.

5        But Mr. Guerrero in that case did receive this

6    special skill enhancement.  He had been trained as a spy in

7    Cuba and received specialized training in civil engineering

8    and radio technology and computer technology, and then used

9    those skills to send his handlers in Cuba detailed reports

10   about a naval air station where he was ostensibly working as a

11   laborer or a janitor, but really was there to observe what he

12   was -- what was going on there, and because of his special

13   skills, his observations took on a different meaning.  That

14   particular case really does not apply here.  Mr. Dalke didn't

15   somehow sneak into the NSA and use other skills he had

16   developed elsewhere to commit the offense.

17       The *Kyereme* case, which is K-y-e-r-e-m-e, was an IT

18   contractor who worked for the City of Newark and was

19   authorized to order computer repair equipment and parts from a

20   company called Cisco as the City of Newark's computer systems

21   broke down and needed to repair and fix them.  He worked in

22   the IT field for almost 20 years.  Because he had that

23   experience and expertise, his requests -- he tailored his

24   requests for replacement parts to be credible based on his

25   knowledge of technical language and the type of parts that

```
22-cr-0313-RM          Sentencing          04/29/2024    12
```

1    would need repairs, and that allowed him to commit the

2    offense.

3           Otherwise, his e-mails to Cisco asking for

4    replacement parts would have raised suspicion.  Again, we

5    don't have that here.  Mr. Dalke wasn't communicating with

6    anyone else in a way that he needed special skill to convince

7    them what he was saying was true or somehow facilitated the

8    offense based on that specialized knowledge.

9           The *Peterson* case was described in the published case

10   as a self-taught hacker.  He had previously worked to advise

11   companies securing their computer networks, hacked into a bank

12   system, stole over $150,000, placed wiretaps on corporate

13   phone systems, transferred large sums of money between banks.

14   Ultimately, he pled guilty to computer fraud and a variety of

15   other crimes, but, again, it was all about his skills as a

16   hacker that allowed him to do those specific acts.

17          In this case, the Government seems to concede that

18   the exfiltration itself did not require special skill, but

19   rather focuses their argument on Mr. Dalke's conduct after the

20   exfiltration.  So in addressing that, I would just note that

21   they argue that he used a variety of encryption programs or

22   systems to secure his personal devices, including BitLocker or

23   VeraCrypt.  They don't say that he understands the coding

24   behind those, just that he accessed them, obtained them, and

25   used them to encrypt his devices.

                     Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   13

1          They do note that he had used VeraCrypt on some

2   devices where top secret information was found, and that he

3   used passwords of, quote, extreme length and complexity that

4   required use of other key files that he had hidden among other

5   similar files on his computer.  But there's no argument that

6   use of an extremely long or complex password requires special

7   skill that Mr. Dalke had developed or worked on or had been

8   trained in.  A password is a password, and anyone can set it

9   as long or as short as they wish.

10          They also argue that he used VPNs and a system called

11  the Onion Router or T-o-r, Tor, to modernize his Internet

12  activity.  First of all, I think that most people in this room

13  use VPNs every day.  They're very simple.  You enter a user

14  name and a password, and you're accessing whatever server you

15  need to access remotely.  Nothing could be easier.  If I could

16  do it, I think anyone could do it, and I do do it.  And in

17  terms of the Onion Router, we see that all too often in cases

18  of a different nature where people with no education

19  whatsoever can successfully use this to access information

20  that they should not access on the Internet, but there's

21  nothing overly complex about using a Tor.  The Government goes

22  on to say he used Proton mail.  Millions of people use that,

23  and it requires -- use of the system requires no knowledge of

24  how the system works.

25          The same argument is made about cryptocurrency.  They

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM              Sentencing              04/29/2024    14

1    say he used Monero, which is true, he did.  It's one of the

2    most popular and widely used forms of cryptocurrency.  It is

3    the most popular privacy coin or anonymity-enhanced

4    cryptocurrency.  In 2022 when Mr. Dalke used it in this case,

5    there was approximately 24,000 transactions per day in Monero.

6    Then he used Kraken to convert it to U.S. dollars, similarly,

7    if not even more widespread than Monero.  And, again, no

8    knowledge of how the system works is required to use it

9    successfully.  Over 10 million people use Kraken at any --

10   regularly at any given time.

11          The Government argues that he successfully completed

12   what they've characterized as a digital dead drop at Union

13   Station in late September 2022.  We would just point to the

14   one page of instructions given to him by the undercover agents

15   in the discovery that we discussed earlier.  Very simple

16   step-by-step instructions.  Nothing about following those

17   instructions required Mr. Dalke or would require anyone to

18   have a special skill in using computers or encryption or

19   anything of that nature.

20          The Government then argues that he removed the GPS

21   unit or GPS function from his truck and left his cell phone at

22   home.  That's not a special skill.  They're not claiming he's

23   a mechanic or understands the interworkings of a truck's

24   technology, and leaving a cell phone at home is about the most

25   common thing that people may do when they don't want to be

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   15

1    tracked.  So we're not saying that was necessarily a

2    mitigating decision, but it certainly didn't require a special

3    skill.

4            And then, finally, they note at the end of their

5    laundry list of these aspects of the case that he possessed on

6    his person on September 27th instructions to modify a MAC

7    address, or M-A-C address.  One, it's unclear if he ever used

8    it.  It doesn't appear that he used it -- used those

9    instructions.  And, two, it's not clear where those

10   instructions came from, if he wrote that down from memory, if

11   he wrote that down for himself, if he copied it off a website,

12   or if it really had any role in contributing to the offense

13   itself.

14           So although the Government does list many aspects of

15   the case that would appear at first glance to require some

16   degree of technological savvy, IT skills, knowledge of

17   encryption, all of those things, when we really drill down and

18   look at each one of these aspects, each one of these actions

19   Mr. Dalke engaged in, none of them required the use of special

20   skill in the sense that the cases require for this

21   enhancement.  Instead, I think when we look at all of this

22   together, Mr. Dalke appears to be much closer to the defendant

23   we discussed in our pleading --

24           THE COURT:  Time is running slowly, but it doesn't

25   run that slowly.  I don't need the case.

                         Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM              Sentencing              04/29/2024    16
```

1          MR. KRAUT:  The video store owner.  Thank you.

2          THE COURT:  Counsel, please.

3          MS. MARTINEZ:  Ms. Neuscheler will address this

4     argument, Your Honor.

5          MS. NEUSCHELER:  I will actually try and stick to two

6     minutes.

7          THE COURT:  I won't, but go ahead.

8          MS. NEUSCHELER:  Mr. Dalke plainly possesses

9     specialized computer skills.  He has a bachelor's degree in

10    cyber security and information assurance, and as the PSR

11    describes, he has several cyber-related certifications, and

12    throughout multiple aspects of his commission and concealment

13    of the offense he used those specialized computer skills.  The

14    four electronic devices on which the charged documents were

15    located, the FBI in reviewing those devices discovered that he

16    not only used an encryption software called VeraCrypt, but he

17    used it in an advanced manner.

18         Instead of simply requiring a password of any length

19    or complexity to access those documents, he required the user

20    to both put in an extremely complex password and present five

21    key files at the same time, and those key files were buried

22    amongst hundreds of key files of similar size, name, and

23    location, just to make it more difficult to access the files.

24    And even after the user successfully sort of completed those

25    steps, there were encrypted containers nested within those

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM                Sentencing              04/29/2024    17

1    encrypted containers.

2           From the Government's perspective, this is not the

3    type of encryption that a standard average computer user would

4    employ.  This was employed specifically to conceal the fact

5    that he had taken these top secret documents and saved them on

6    his personal computer.  He wanted to make it harder for anyone

7    who might be investigating him to access these files, and so

8    he used his advanced encryption skills to do that, to make

9    sure that that would work, and that's a theme that was

10   occurring throughout -- throughout the steps he took after he

11   walked out of NSA with those classified documents.

12          As defense counsel noted, he used various types of

13   software that are designed to increase your anonymity online.

14   He used Tor.  He used VPNs.  He operated multiple virtual

15   machines from his computers.  Any one thing on its own might

16   not demonstrate the use of specialized skill, but together all

17   of these demonstrate a savvy computer user who's trying to

18   conceal the fact that he stole and has saved multiple

19   classified documents in this case.

20          Relatedly, even his selection of the platform to use,

21   Proton mail, in messaging the OCE in this case, again, the

22   selection -- you don't have to understand the software

23   underlying the entire platform, but it's a decision you make

24   because you know as a skilled computer user the kinds of

25   tracks a computer can leave behind.

                        Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    18

1          THE COURT:  Just so we're clear, I understand you

2    completely.  And I don't really speak to people in the back,

3    but to the extent that the acronyms mean something, when you

4    say OCE, you mean the individual law enforcement agent who was

5    pretending to be an agent of the -- of Russia.

6          MS. NEUSCHELER:  Yes, I do.  Online covert employee

7    is the OCE.

8          THE COURT:  All right.  I managed to know that.  Go

9    ahead.

10          MS. NEUSCHELER:  Yes, Your Honor.  In addition to

11    sort of his use of the VPN, the Tor, the virtual machines, he

12    took other steps even as it related to the day of the dead

13    drop, and, again, just demonstrating a knowledge of how

14    electronic devices and computers work and the footprints they

15    leave behind, and he took steps to mitigate that that go

16    beyond that of an average person.  We do not think he's a

17    mechanic, but he did remove the GPS unit from his car because

18    he was aware of the track that that could leave behind

19    electronically for him.

20          He did take the time to get a Wi-Fi extender.  In the

21    days leading up to the dead drop, he drove around and tested

22    it to see how far away he could be from the Wi-Fi and still

23    connect to it successfully.  And why did he do that?  To

24    conceal the fact that he had stolen these documents and was

25    trying to sell them.

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    19

1        THE COURT:  In fairness, though, the Wi-Fi extender

2   did not work with the dead drop that the FBI set up in Union

3   Station.

4        MS. NEUSCHELER:  Correct.  He was not successful in

5   that sense, but he still practiced and attempted to use his

6   skill set successfully.  And, again, you know, the same -- in

7   that same vein, he also left his cell phone at home, again,

8   because he was aware of the properties that could be left

9   behind.  So from the Government's perspective, this is pretty

10  open and shut.  He possesses specialized computer skills, and

11  throughout the commission, but especially the concealment of

12  this offense, he used those computer skills in furtherance,

13  and on that basis alone the enhancement should apply.

14        I'm also happy to address the abuse of trust.  The

15  Government's perspective is *Williamson* gets us here by

16  analogy.  I'm happy to answer any questions.

17        THE COURT:  No.  I mean, look, like I said, my view

18  of *Williamson* is that if I were writing with a blank slate, I

19  would not reach the conclusion that the circuit reached

20  because I cannot reconcile that with what's said later, nor

21  with the application note.  I'm also mindful of the fact that

22  it was a bizarre arrangement, and what I mean by that is that,

23  if I'm remembering correctly, there really wasn't much

24  pushback on whether it was an abuse of position of trust.

25  What it was was this kind of notion that, well, he's this kind

```
            22-cr-0313-RM          Sentencing         04/29/2024   20
```

 1   of a police officer as opposed to that kind of a police

 2   officer, and then the debate had to come from whether a

 3   traffic cop versus a drug cop and how that all worked out.

 4            So to some extent, the underlying debate that led to

 5   the opinion is on a different footing than the one we're

 6   having here today, but *Williamson* is still *Williamson*, and it

 7   still is what the circuit -- I mean, they've never pulled back

 8   from it, and as recently as in 2013, the Eighth Circuit has

 9   said basically the same thing.

10            MS. NEUSCHELER:  Okay.

11            THE COURT:  They're not binding on me either, but the

12   fact that it is lining up with something that the Tenth

13   Circuit has said is not lost on me.

14            MS. NEUSCHELER:  Yes.  There's been recognition at

15   this point in at least two circuits that certain occupations

16   are by nature positions of trust, and while --

17            THE COURT:  Having said that, you know, the

18   commission when it wants to do that knows how to do it.  It

19   did it with the post office.

20            MS. NEUSCHELER:  I hear what the Court is saying, but

21   the Tenth Circuit in *Williamson* did take the time to tell us

22   that certain positions are just sui generis, and the

23   Government would submit that this is one of those instances.

24            THE COURT:  All right.  I'm going to give the

25   adjustment.  I don't want to go on at great length because I

                      Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024   21

1   don't think it's necessary.  To the extent that *Williamson*

2   remains the law of the circuit, and I have seen nothing that

3   indicates that it is not good law, it is hand in glove

4   analogous to what we have here, an individual given a special

5   trust by the government.  Different level of government, mind

6   you, but an individual taking an oath to protect, an

7   individual taking oaths to uphold the Constitution, and then

8   using, if not special knowledge, for sure, special access

9   while at the NSA to get these top secret documents.  And to

10  the extent that *Williamson* remains the law, I find it to be

11  decisive in terms of how I should rule.

12          To the extent that I were to say that *Williamson* does

13  not apply, and absent *Williamson* I would not find this to be a

14  position of trust within the term of art that's been used in

15  the guidelines in light of the application note, but I would

16  still find there to be use of a special skill, I basically

17  agree with what Ms. Neuscheler has said.  It is not required

18  that use of a special skill requires that you understand the

19  code or that you be a mechanic or that degree of

20  specialization is needed.  It does not require that, for

21  example, a doctor have some special knowledge of how, I don't

22  know, a medicine is made or what have you.

23          At the end of the day, there are two extremes here

24  that need to be avoided.  One is the overly picky notion that

25  somehow he's got to know the code or somehow the number of

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    22

1   persons that share this knowledge is definitive as to whether

2   or not he has a special knowledge.

3            The other extreme is the danger that the Court, being

4   comprised of largely older people, might be a little bit of a

5   dinosaur with respect to computers where, you know, teenagers

6   can run circles around them, and to go, oh, look at that, VPN,

7   what is VPN, that's so significant, and give somebody an

8   assessment because of something that is perhaps not part of

9   the Court's personal experience, but not really all that

10  unusual in the broad today common world that we live in for

11  people who have kind of grown up with computers, which is more

12  Mr. Dalke than it is me.  That being the case, I don't find

13  this to be at either extreme.  I really don't.

14           It's looking at the totality of the circumstances.

15  And it's not any one thing.  It's the multitude.  He does have

16  -- to be clear, I'm not limiting this to special skill with

17  respect -- or special knowledge and skill with respect to

18  computers and computers alone.  It's computers and security

19  systems.  Those are the two that come into play here, and it

20  is the collective of those that is being used here, and it is

21  more than the ordinary person.  It is within the scope of the

22  guideline.

23           Any one thing -- you know, okay, fine, he used a VPN.

24  We all use VPNs.  But it's the combination.  It's the use of

25  virtual machines.  It's the use of encrypted containers.  It's

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   23

1   the nesting of encryptions within encryptions.  It's the use

2   of files being distributed across a minefield, if you would,

3   of other files so that you have to be able to figure out which

4   ones to use in order to encrypt.  It's the use of the e-mail

5   system that was used.  It's the use of the monetary systems

6   through which payments were made.  It's the use of knowing to

7   leave the security in the car -- to remove the chip from the

8   car.  It's the use of the -- the attempted use of the Wi-Fi

9   extender.  It is not any one thing.  It is the combination.

10          And I am comfortable that when I look at the

11  combination as recited by me now, as contained in the

12  presentence report, and as contained in the Government's

13  filing, that he, regardless of what I might otherwise think

14  about whether or not he has a position of trust within the

15  meaning of the guidelines, there is the use of a special skill

16  and knowledge, and therefore I'm giving the assessment.  As a

17  consequence of that, what we have is that the guidelines are

18  fairly straightforward.

19          It is a base offense level of 42.  There are no

20  specific characteristics contained within the guidelines.  In

21  addition, it goes up to -- because of abuse of position of

22  trust from Chapter 3, that guideline which covers both

23  position of trust and special skill, so it then goes up to 44.

24  Comes down for acceptance of responsibility three points off.

25  So it's a 41, I.  At 41, the guideline range is 324 to

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    24

1   405 months of imprisonment.  I am required to do the guideline

2   calculation.  I am required to consider the calculation.  I am

3   not required to follow the calculation.

4          It inevitably, however, leads into the next step,

5   which is the matter that I said stick a pin in, and that is

6   the Government has filed a motion requesting that I depart

7   downward from the guideline range from the low end of that

8   range of 324 months to a range -- to a number of 262 months,

9   that being what they will ultimately ask me for in this case.

10  And the reason for that request has to do with the fact that

11  post arrest -- and I'll just be broad in terms of my

12  descriptions here -- Mr. Dalke has cooperated, not against

13  others, but in terms of his own conduct and enabled the

14  Government to retrieve, protect, and to the extent that it is

15  understood by the Government, fix some of these exposures or

16  risks that were occasioned by his removal and subsequent

17  retention and movement of these classified documents.

18         I said that I was putting a pin in it because the

19  Government's view was what exactly it wanted to do by way of

20  that motion depended upon whether or not I ruled in favor of

21  the Government on the abuse of position of trust adjustment.

22  I do not rule in favor of the abuse of position of trust

23  adjustment, so that this further reduction can apply, but it

24  is the fact that having so ruled, the Government has filed a

25  motion requesting the reduction, and there is no opposition to

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing           04/29/2024   25

1   the grant of that motion, and I now grant the motion that is

2   best described as a 5K2.0 motion.  Any difficulty so far?

3            MS. MARTINEZ:  None.

4            MR. KRAUT:  None, Your Honor.

5            THE COURT:  All right.  So let's get to it.  Where we

6   are now is that the things that I must do by way of

7   calculation, and it is but one of the sentencing factors that

8   I must consider, but I had to go through that to get to where

9   we are.  Bottom line, I have the Government saying 262.  I

10  have the defendant saying 168.  Neither of those are things

11  that I have to do.  I can do what one side requests, what the

12  other side requests, what neither requests.

13           Ms. Martinez, the floor is yours.  And, again, these

14  are awkward proceedings, because in terms of those in the

15  back, sentencing is not about them.  It's not for their

16  benefit.  But to the extent that there is interest, there has

17  been a two-and-a-half-hour hearing in advance of this hearing

18  where certain matters were discussed that will not be

19  discussed in this room and cannot be discussed in this room.

20  I don't mean -- well, I do mean to say I'm keeping secrets.

21  That's exactly what I'm doing.  And that discussion the Court

22  is aware of and brings to bear, although it does not intend to

23  comment on it.

24           MS. MARTINEZ:  Thank you, Your Honor.  And the

25  Government appreciates the Court protecting classified

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    26

1    information.  To the Court's comments, sentencing is a public

2    proceeding, and with the Court's indulgence, I will speak to

3    the Court, but to the public as well.

4         THE COURT:  I get it.  I get it.  I get it.

5         MS. MARTINEZ:  In June of 2022 the defendant began

6    working for the National Security Agency, NSA.  His job, the

7    job that he was hired to do and the location in which he was

8    hired to do it and the information with which he was required

9    to work necessitated a top secret security clearance and

10   access to top secret information.  When he began his job in

11   2022, he took an oath to protect and defend the Constitution

12   of the United States, and he acknowledged and agreed to a

13   lifetime binding legal obligation to protect classified

14   information.  But instead of honoring that oath or protecting

15   classified information, he stole it and tried to sell it to

16   one of our adversaries.

17        Top secret information is by definition and under

18   executive order information which, if disclosed in an

19   unauthorized manner, could reasonably be expected to cause

20   exceptionally grave damage to the national security of the

21   United States.  What I can say here in these proceedings about

22   the three top secret documents that the defendant stole and

23   tried to sell to Russia is that they related to a threat

24   assessment of a foreign government's military capabilities,

25   plans to update a certain cryptographic program, and

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    27

1    information related to sensitive U.S. defense capabilities.

2          To be clear, the reason that I cannot say more here

3    is because doing so would be an unauthorized disclosure that

4    would reasonably be expected to cause exceptionally grave

5    damage to the national security of our country.  The defendant

6    knew that, just as all of us who hold security clearances know

7    that.  In fact, he had been trained and advised of that just

8    days before he began executing his plan.  He also knew it

9    because he read the documents, and he knew the information,

10   the exceptionally sensitive top secret national defense

11   information that they contained.

12         The defendant began working at the NSA on June 6th.

13   By July 1st, he had stolen top secret documents, and he had

14   resigned from the NSA.  He cited a medical issue with a family

15   member and told his employer and his colleagues that he

16   intended to reapply in a few months and come back.  But he was

17   gone.  His dates of employment were June 6th to July 1st.  And

18   when he left, he left with top secret documents.  And he

19   returned here to Colorado, which is where he lived, with those

20   documents.  He digitized them.  He encrypted them, containers

21   within containers and all of the technical details that

22   Ms. Neuscheler so aptly summarized.

23         And then by August 6th, two months after he had begun

24   employment, by August 6th he had e-mailed excerpts of those

25   top secret documents to someone he believed to be an agent of

1    the Russian government.  He asked for a particular

2    cryptocurrency to be paid in exchange for that top secret

3    information.  He described the classified information that he

4    had in his possession and to which he had access, and he

5    promised future access to more classified information.  He

6    explained to this e-mail account that he believed to be

7    utilized by an agent of the Russian government, quote, I have

8    challenged our role in damage to the world in the past, and by

9    mixture of curiosity for secrets and a desire to cause change,

10   I put in for the position I am currently in.  He continued,

11   Beyond that, I find myself in financial need.  There is an

12   opportunity to help balance scales of the world while also

13   tending to my own needs.

14           And so he asked for $85,000.  $85,000 in exchange for

15   these three top secret documents.  $85,000, which, as it

16   happened, was the approximate yearly salary that the NSA would

17   have paid him had he stayed beyond the less than a month of

18   his employment.  So he asked for the amount that he could have

19   gotten from the government through a year's honest work and

20   instead tried to betray his country and double his yearly

21   salary.

22           It's only due to the very fortunate fact that the

23   defendant was actually talking unknowingly to an FBI agent and

24   to the excellent work of the investigators on this case that

25   we are here today discussing this relatively astonishing

22-cr-0313-RM          Sentencing          04/29/2024      29

1    story, because the defendant made every effort not to be

2    identified.  He used a foreign encrypted e-mail service.  He

3    anonymized himself.  He chose a cryptocurrency that's

4    notoriously difficult to trace, and he never revealed his

5    identity.

6            While he went back and forth for nearly two months

7    over e-mail with this person he believed to be an agent of the

8    Russian government, he never revealed identifying information

9    about himself.  He told enough to prove that he had access,

10   including by attaching excerpts of these documents, and he

11   gave some truths and some half-truths.  The core was true,

12   that he had access to exceptionally sensitive information.

13   The core was true that he expected to have future access.  He

14   held himself out as a current government employee, which, of

15   course, he was not, because he had resigned after less than a

16   month of employment.  But he did, in fact, expect to have

17   future access to classified information, because as he told

18   his colleagues as he departed, he planned to reapply, and

19   reapply he did.

20           Because as he went back and forth with this e-mail

21   account whom he thought was an agent of the Russian government

22   and negotiated when and where and how and for how much he

23   would sell Russia our top secret information, he was also

24   reapplying to the NSA for a new position, a position that also

25   would have required a top secret clearance, would have

                      Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   30

1   required him to take that same oath, and would have continued

2   his access to top secret information and his lifetime binding

3   obligation to protect classified information.

4          Ultimately, the defendant and the FBI agent that he

5   believed to be a Russian agent agreed to what I'll call a

6   digital dead drop here in Denver at Union Station.  And the

7   way the digital dead drop was to work was that the defendant

8   was given information over e-mail about how to connect to a

9   particular secured Wi-Fi network that would be available only

10  in a particular location, Union Station, and only at a

11  specified time, a specified date, and also a time window.

12          And the details of that information were all conveyed

13  to him over e-mail.  He wrote them down on a Post-it note and

14  took it with him so that he could, in fact, access that

15  digital dead drop.  And so on the morning of the day of his

16  arrest, he had been preparing for days.  He had purchased

17  what's called a Wi-Fi extender, a big antenna that allows you

18  to access a Wi-Fi network if it's turned on from farther than

19  you would be able to without that Wi-Fi extender.  He had been

20  driving around areas around his home in Colorado Springs

21  testing how far away he could get.  He took many efforts to

22  not be identified.

23          He left his cell phone at home, which, as Your Honor

24  observed, is sort of the first 101 for someone who doesn't

25  want to be traced.  He removed the GPS tracker from his truck.

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   31

1   He actually reached out to others, to friends of his to see if

2   he could get a ride from somebody else rather than take his

3   own vehicle.  And, again, he emphasized to who he thought was

4   his Russian handler that he wanted to remain anonymous.

5   Throughout this entire time he never identified himself.  He

6   never even identified his location.

7          He ultimately chose Denver as a place for the digital

8   dead drop, but with a whole convoluted story about why he was

9   in Colorado at the time, and it was for a conference, and he

10  would have access, trying to imply that he actually resided

11  elsewhere.  And so on the morning of the arrest, he got into

12  his car with no GPS tracker and with no phone, but he brought

13  with him a laptop, an SD card, both of which he would use to

14  transfer the top secret documents.  He brought a firearm for

15  protection.  And he left his home in Colorado Springs early

16  enough that with the expected drive to Denver, he should be at

17  Union Station right at the beginning of that window that his

18  Russian handler, but actually the FBI, had set for him to

19  complete the digital dead drop.

20         He drove north on I-25.  He exited.  He drove towards

21  Union Station, and he parked behind Union Station a couple

22  blocks away.  He got out of the car.  He had his Wi-Fi

23  extender with him in a backpack.  He had his firearm.  He had

24  the computer.  He had the SD card.  And then he stopped at

25  multiple points attempting to use that Wi-Fi extender, again,

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM             Sentencing           04/29/2024    32

 1   so as not to be identified by his supposed Russian handler or

 2   by law enforcement.  The Wi-Fi extender didn't work, and he

 3   was unable to access the network until he actually stepped

 4   foot into Union Station.  And so he did.

 5          He walked in.  He sat down on one of those wooden

 6   benches.  He took out his laptop.  And utilizing the laptop

 7   and the SD card and the instructions on that Post-it note that

 8   he had with him, he transferred five files that consisted of

 9   three top secret documents and an annex, along with a letter.

10          THE COURT:  Was there anything else that he had?

11          MS. MARTINEZ:  Was there anything else he had in his

12   possession?

13          THE COURT:  Yes.

14          MS. MARTINEZ:  With him he had a backpack.  He had

15   clothing.  He was wearing a mask.  To be fair, it was --

16          THE COURT:  I'm giving you a hint.

17          MS. MARTINEZ:  He had a firearm.  Yes, Your Honor.

18   He brought the firearm with him from Colorado Springs.  He

19   brought the firearm with him in the vehicle.  He brought the

20   firearm with him when he exited his vehicle.  He brought the

21   firearm into Union Station.

22          THE COURT:  All right.

23          MS. MARTINEZ:  He brought the firearm with him for

24   his protection, because what he was engaged in was inherently

25   dangerous.

                        Sarah K. Mitchell, RPR, CRR

1           THE COURT:  He has a different view of that, but I

2    just want -- to the extent that we're talking about what

3    happened, I want to be clear about those things that we can

4    talk about.

5           MS. MARTINEZ:  Yes.  He had his firearm on him when

6    he was arrested, which was moments after he tried to hit

7    transmit on those documents.  One of the documents that he

8    transmitted was a letter, a letter to his Russian handlers.

9    The letter started with a greeting in Russian Cyrillic

10   characters, My friends, exclamation mark.  Then he continued

11   in English, I am very happy to finally provide this

12   information to you.  I thank you for your great efforts to

13   accommodate this transfer.

14          He continues for another half a paragraph and a

15   paragraph, and then he closes in this way.  I look forward to

16   our friendship and shared benefit.  Please let me know if

17   there are desired documents to find, and I will try when I

18   return to my main office.  Until then, when I return to my

19   home office I will keep an eye out for documents that I think

20   may be of interest to you.  He signs it again in Russian with

21   Cyrillic characters.

22          The day before his arrest he accepted a conditional

23   offer of employment at NSA.  He fully expected to return and

24   to have access to classified information, because, you see,

25   Your Honor, this was not just three documents for a yearly

                      Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing         04/29/2024    34
```

1    salary of $85,000.  This was the beginning of a beautiful

2    friendship in his mind between himself and his Russian

3    handler, a beautiful and lucrative friendship where he would

4    continually exfiltrate information, sensitive top secret

5    national defense information, and sell it to our adversaries.

6              The defendant's actions were brazen, and his betrayal

7    was staggering.  One of the documents submitted to Your Honor

8    in support of sentencing is a letter from the director of NSA,

9    General Timothy D. Haugh.  That letter was submitted with

10   restricted pleadings, but with the Court's permission, I'd

11   like to read it publicly.

12             THE COURT:  As you know, I restrict pleadings because

13   frequently there are things that relate to personal

14   information that relate to a variety of things that shouldn't

15   be public.  That I have no difficulty with you providing or

16   reading.

17             MS. MARTINEZ:  Thank you, Your Honor.  Dear Judge

18   Moore.  I am writing to offer the perspective of the National

19   Security Agency, NSA, on the impact of Jareh Dalke's crimes on

20   the NSA and on the national security of the United States.

21   Due to the sensitive nature of the classified national defense

22   information that Mr. Dalke attempted to transmit to the

23   Russian Federation, I cannot in the unclassified statement

24   fully address the damage that would have resulted had

25   Mr. Dalke been successful in his attempt to commit espionage.

22-cr-0313-RM                Sentencing           04/29/2024    35

1    I direct your attention to the classified declaration from the

2    technical director of the NSA's cyber security directorate for

3    a more fulsome description of the enduring impacts to both the

4    NSA and to national security.

5         At the unclassified level, I can confirm that the

6    transmission of the documents that Mr. Dalke stole during his

7    employment with the NSA would have resulted in exceptionally

8    grave damage to the national security of the United States had

9    Mr. Dalke succeeded in his attempt to transmit them to the

10   Russian Federation.  I can also confirm that successful

11   transmission of the documents would have compromised sensitive

12   intelligence sources and methods, endangered national security

13   systems, and imposed exponential recovery costs on the U.S.

14   Government.

15        Mr. Dalke was aware that the information in his

16   possession would be highly valued by our adversaries and would

17   damage the national security of the United States.  Yet

18   Mr. Dalke attempted to transmit it to a foreign power for

19   personal financial gain.  His story is one of exceptional

20   betrayal.  As the record shows, Mr. Dalke knowingly and

21   willfully violated the laws of the United States, acted with

22   complete disregard for his oath of office and pledge of

23   allegiance to the Constitution of the United States, and

24   intended to return to the NSA for the apparent purpose of

25   engaging in additional crimes against the United States.

                        Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM              Sentencing              04/29/2024    36

1          I appreciate your consideration of the agency's

2    perspective as you deliberate over what will amount to a just

3    sentence for the crimes Mr. Dalke committed against the United

4    States.  Timothy D. Haugh, General, U.S. Air Force, Director,

5    NSA.

6          Your Honor, we're asking today for the Court to

7    impose a sentence of 262 months.  With Your Honor's resolution

8    of the guideline dispute between the parties, that is a

9    sentence that is substantially below the low end of the

10   guidelines range as calculated in the PSR and now by the Court

11   --

12         THE COURT:  It's five years off.

13         MS. MARTINEZ:  -- of 324 months.  Agreed.

14         THE COURT:  In round terms.

15         MS. MARTINEZ:  In round terms.  And even more of a

16   reduction from anywhere higher in the range of 324 up to

17   405 months.  The reason that we are asking for a sentence of

18   262 months as opposed to a guideline sentence is because, as

19   the Court already stated on the record, the defendant

20   cooperated in this case.  There were no other individuals,

21   coconspirators or codefendants, against whom he could

22   cooperate.

23         However, his cooperation was meaningful to the

24   Government because it allowed us to further secure classified

25   information, to mitigate against harm that he had caused, and

Sarah K. Mitchell, RPR, CRR

1    to better understand the scope of the defendant's conduct.

2    And for those reasons, we have moved for a reduction in

3    sentence, and -- a reduction in sentence, and a reduction in

4    this case below the guidelines as calculated by the Court.

5          The Government's position is that a sentence of

6    262 months would appropriately account for the 3553(a) factors

7    that the Court must consider, and also the cooperation that

8    the defendant provided.  One of the 3553(a) factors, of

9    course, is the seriousness of the offense, and I've just

10   described the offense that the defendant engaged in.  And the

11   Government submits that it is extraordinarily serious.  He did

12   this intentionally.  He did it willfully.  He took top secret,

13   extremely sensitive national defense information that he knew

14   would harm the Government, and he sold it to someone he

15   believed to be an agent of an adversary, knowing that it would

16   harm our national security, intending to harm our national

17   security, and, again, for profit.

18         I won't belabor the seriousness of the offense here

19   because I've already described in detail what it is that he

20   did, but the Government's position is that the Court should

21   heavily weigh the seriousness of that conduct in determining

22   what would be a just punishment and what would promote respect

23   for the law that the defendant so flagrantly disregarded.

24         THE COURT:  No one factor is -- there's no scale

25   that's applied to the consideration of factors.  I want to be

```
22-cr-0313-RM          Sentencing          04/29/2024    38
```

 1    clear that all of them will be considered.  I want to be

 2    equally clear that I am not putting my thumb on the scale and

 3    more heavily considering some as others.  I'm looking at them

 4    all, and all of them will be considered.  Some of them may be

 5    in any particular case more compelling, but it's one of seven,

 6    and I'll look at all seven.

 7          MS. MARTINEZ:  As you should, Your Honor, and as the

 8    Government urges you to.

 9          THE COURT:  And I'm not suggesting you said anything

10    to the contrary, but...

11          MS. MARTINEZ:  Moving on to additional 3553(a)

12    factors, one of the other factors that the Court must consider

13    is whether or not a sentence would be greater than comparable

14    cases, and --

15          THE COURT:  Well, let me stop you, because, frankly,

16    I'm going to talk about this, because I don't like the way any

17    of this has kind of developed, and I don't mean to be

18    critical.  Both sides have taken quite professional and expert

19    efforts to get before me as much information as they can.  One

20    of those efforts has been from both sides to identify other

21    cases and to say this case is more like that case.  Or, as the

22    defense notes, if you look at classified -- espionage cases,

23    the sentence that the Government is asking seems higher in

24    this case than it does in other espionage cases.

25          I have a lot of thoughts in this area, and, frankly,

22-cr-0313-RM          Sentencing          04/29/2024   39

1    when I'm done, if you want to say anything else, fine, but it

2    will likely be water off the duck's back.  The first thing is

3    this.  The way sentencing works is there are certain goals of

4    sentencing that I must have in mind and must impose a sentence

5    that is sufficient but not greater than necessary to meet

6    those goals.

7          They are the need for the sentence imposed to reflect

8    the seriousness of the offense, to promote respect for the

9    law, to provide just punishment for the offense, to afford

10   adequate deterrence to criminal conduct, to protect the public

11   of further crimes of the defendant, and to provide the

12   defendant with needed educational, vocational training,

13   medical care, or other correctional treatment in the most

14   effective manner.

15         In building a sentence that is sufficient but not

16   greater than necessary to achieve those goals, I look at those

17   things I've just said and six other things.  In terms of the

18   factors for consideration, none of them is controlling.  I

19   could say with respect to the guidelines this is the

20   guideline.  I think it's too high.  I think it's too low.  I

21   think it's poorly reasoned.  I think it's stupid.  And I can

22   choose to not follow it.  With respect to the policy

23   statements, I could say the same thing.

24         Frequently in criminal cases, I hear -- sometimes

25   from the Government, sometimes from the defendant -- efforts

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    40

1    to compare this case with other cases.  Sometimes it's with

2    codefendants.  Sometimes it's with other cases that have been

3    before the Court.  And I think that's all legitimate, and it's

4    all proper, but I think sometimes too much importance is

5    placed on it, because it is but a factor to consider.

6         Now, in this case, my personal view after looking at

7    everything that I have been given is that it is not a factor

8    that will be in any way a controlling factor for me.  The

9    reason I say that is that there really isn't enough

10   information available to really talk about unwarranted

11   sentencing disparities.  It is not the case that you find one

12   judge here or one judge there who says, oh, look, that judge

13   did this, so now I have to do what that person does.  I

14   guarantee you in the months to come there's a judge in

15   Massachusetts that's not going to say here's what Moore did,

16   so now I've got to do X, Y, or Z.  That is simply not how this

17   works.

18        What did I do to educate myself?  I asked the

19   probation officer to contact the sentencing commission, and I

20   didn't really expect too much of an answer from them, but say

21   give me the names of the cases that have been resolved within

22   the last five years or so under this guideline and this

23   statutory offense.  And what I got was nothing, largely we

24   don't have that information, you'd have to ask our research

25   division, and, probation officer, you're not worthy.  We won't

Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM            Sentencing          04/29/2024    41
```

1    talk to you.  The judge has to contact us directly.  That's

2    fine.

3            I was fully aware of the fact that I have skilled and

4    very competent and exceptionally good lawyers on both sides,

5    and I'm not going to start this, because one of them is doing

6    it.  I know they're doing it.  And they were.  There is a tool

7    that the sentencing commission makes online.  I suspect that

8    they have someone there who lives with irony.  It's called

9    JSIN, judicial sin, whatever.  But what it's designed to do is

10   I punch in the guideline, and I punch in the range and

11   whatever, and it presents me with sentencing data over a

12   period.  I think it's a five-year period or so.  I did it just

13   to see what would happen, and what happened is what I knew

14   would happen.  Not enough data, and so it would not give me

15   the information.  It could not give me the information.

16   There's not enough cases.  That's a good thing.

17           Notwithstanding that, everybody flooded me with cases

18   that they found using their own resources.  The broadest

19   collection was Mr. Kraut's going to the -- or his office --

20   going to the sentencing research division, whatever they call

21   themselves, and getting a report or some data from them which

22   he gave to me.  Forgive me, I'm trying to find -- and that's

23   all well and good, but I find it particularly unconvincing.

24   Essentially what it was, and I'm stalling so I can find the

25   place where it was summarized.  There we go.  It's ECF No.

```
22-cr-0313-RM          Sentencing          04/29/2024    42
```

1  57-23.

2          It's essentially telling me that for this guideline

3  range, 2M3.1, for a final offense level between 36 and 41 with

4  a criminal history category of I, and at least two levels for

5  acceptance of responsibility, the mean and the median for 11

6  -- 11 cases between 1999 and 2021 is about 180 months.  Okay.

7  So what does that mean?  It means in 11 cases the average is

8  180 months.  So some judges went above.  Some judges went

9  below.  The median is this is the point where an equal number

10  of judges went above and below.  It's all very useful, and I'm

11  not suggesting in any way, shape, or form that it is not

12  appreciated, but it is also not very helpful.

13          Why?  Because if I read it, I sit, and I look, and I

14  say, That's cute.  The guideline range, final offense level

15  between 36 and 41.  2M3.1.  What's 2M3.1 give me if I follow

16  that?  Well, without getting into all the nuts and bolts of

17  it, it sweeps in cases that involve secret but not top secret

18  information.  It just does.  And so less serious offenses get

19  drawn into it, and even then I've only got 11 cases.  When I

20  say that it's because 37 is the offense level instead of 42,

21  but it's not top secret information, you frequently get two

22  levels for abuse of position of trust, 39; take away three for

23  acceptance, 36; and you're right in the sweet spot.

24          So this data that they're giving me includes data

25  that doesn't mean anything to me, and I'm aware of it.  I'm

```
22-cr-0313-RM          Sentencing          04/29/2024    43
```

1   not saying anyone is trying to pull the wool over my eyes.

2   They're not.  I'm just saying there's not much there that I

3   can comfortably use by way of a comparator or the general

4   sweet spot for sentencing.

5          Beyond that, there was a report from -- is it

6   P-E-R-S-E-R-E-C -- whatever the agency or department is that

7   summarizes sentences on espionage cases, and it goes on and

8   on, and I got a great deal of data from it.  And, of course,

9   you can find cases that go below or cases that go above, what

10  you're asking for, what they're asking for, and it's all

11  fascinating and terribly -- not terribly useful in my view.

12         It is always useful to have information, but once you

13  have information, the utility or usefulness of that

14  information is not always high, and that's what's happening

15  here.  Because you can take those stats that they generate,

16  put them in a blender, and they'll tell you whatever they want

17  to tell you.  But I've got cases that go from the guideline

18  era to cases that go to the mandatory guideline era to cases

19  that go before the mandatory guideline era.

20         On top of that, I've got a multitude of different

21  statutes, and, of course, it matters, because guess what?  If

22  you're charged with Section 371, conspiracy to violate the

23  laws of the United States, the maximum is five years, and so

24  if you get a 60-month sentence there, it's kind of hard to say

25  that that tells me something about what I should do in a case

22-cr-0313-RM          Sentencing          04/29/2024    44

1   where in this case it could, but was not -- it could have been

2   considered for a death sentence, but it was not, and the

3   maximum penalty is life.

4          So it becomes a jumble of stats that doesn't mean a

5   whole lot.  And even within that universe, what the defendant

6   said to me was, well, let's take off the top layer, which is

7   people who got life, and take off the bottom layer, which was

8   non-incarcerated outcomes, and the bottom layer was people who

9   committed suicide or they fled to a foreign country and got

10  asylum or they got probation or something like that.  There

11  may have been one probation case in there, if that.  Doesn't

12  matter.

13         I agree it's completely appropriate to take the

14  bottom off.  Why?  Because this is a grade A felony, which

15  means probation is not -- Class A, excuse me -- which means

16  probation is not even possible were I so inclined to give it,

17  so why should I look at that at all.  But I don't agree that

18  you should take off the top just to make the numbers work out

19  better, because the number of cases that got a life sentence,

20  this could get a life sentence.  And I'm not saying it will or

21  won't.  Well, I guess I'm saying it won't, because I've

22  already indicated to both of you that I'm not looking to vary

23  upward from the position of the Government, if I give the

24  Government what it's asking of me.

25         But I think that I just go through all of this, and I

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    45

 1   can go through this on a case-by-case basis, and each of you

 2   spent hours and hours, as I did, going through every other

 3   docket, through the PACER system looking at them, and I could

 4   go through it, and I have no intention of doing it, other than

 5   to say, for example, S-q-u-i-l-l-a-c-o-t-e -- it's not a top

 6   secret case.  It's a pre-*Booker* case.  It's also interesting.

 7   If it's not a top secret case, what is it telling me?  It's

 8   telling me the base offense level was 37.  The woman went to

 9   trial.  37, I.  Guideline range of 210 to 262.  What did she

10   get?  She got 262.  She got a guideline sentence.  So what am

11   I supposed to be saying here?  That everyone should get a

12   guideline sentence?  I don't know.

13          There were other cases where there was cooperation.

14   There is a concept called graymail, and you know exactly what

15   that is, as does the other lawyers -- defense counsel that's

16   involved.  There are circumstances where sometimes deals are

17   made because if they were to go to trial, classified

18   information would be revealed, and rather than do that, the

19   Government swallows and cuts a deal.  Now, that's better now

20   that we have Classified Information Procedures Act which

21   controls some things, but I'm not naive to thinking that that

22   never happens.

23          And then on top of that you've got a number of these

24   cases are military cases where it's a different equation

25   because you have to factor in not only what the military judge

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    46

1   does, but also what the -- I'm going to say commanding

2   officer, but that's not the right term, and I was told the

3   right term, and I've forgotten it -- but the military official

4   who brings the charges also gets to announce after the

5   negotiation with the side a sentence that becomes, if you

6   would, a pocket sentence.  Then it goes to the judge, and if

7   the judge imposes a lesser sentence, then it's a lesser

8   sentence that gets given.  If the judge imposes a greater

9   sentence, then they release him on the basis of the number

10  that was agreed upon.  There's no comparability here.  I'm not

11  sitting down, you're not sitting down, Mr. Dalke is not

12  sitting down with Mr. Finegan and having anything like that

13  happen, nor are they sitting down with anybody from NSA.

14          So look, I've looked at all of it.  I have no doubt

15  that each of you could plant your flag and say a case and say

16  to me, It's just like this one, and you have for a number of

17  cases.  But the truth is each case is unique.  The quantity of

18  cases is simply too small to be meaningful in trying to decide

19  whether there is unwarranted disparity from the mass of cases.

20  I have given the consideration that 3553 requires me to give

21  to this issue, and ultimately, in my view, and in my way, it

22  is not determinative or very influential on any of my

23  decisions here.  There simply is too little data, too little

24  cases, and it is difficult to analogize, because, as in this

25  case, in many, many cases, what's really going on can't be

1   seen.

2          In this case, I can see everything, and I will

3   evaluate the case and the defendant and all of the 3553(a)

4   factors.  But this is not dartboard justice.  Joey got X,

5   Sally got X, give me X.  Joey and Sally are Joey and Sally.

6   Mr. Dalke is Mr. Dalke, and we will proceed on that basis.  So

7   having said all that, and considering it perhaps a rant from

8   the bench, if you want to talk about it some more, you're free

9   to do so.  I won't understand why, but you're free to do so.

10          MS. MARTINEZ:  Your Honor, the Government's argument

11   with respect to the 3553(a) factor that requires the Court to

12   consider not imposing a sentence that would result in

13   unwarranted sentencing disparities is actually pretty much

14   what Your Honor argued.  It's very difficult to do case

15   comparisons in this particular area of law, and the

16   Government's argument boils down to not that any particular

17   case or combination of cases or median value of a sentence

18   dictates the sentence or the Government's request here, but

19   merely that the Government's request of 262 months, were the

20   Court to impose it, would not result in any unwarranted

21   sentencing disparities.

22          THE COURT:  I could conclude that it would and still

23   do it.  That's the point I'm making.  This is not the goal of

24   sentencing.  This is not something that is controlling me.  I

25   could say that there is particular reason that I feel that

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing          04/29/2024    48

1    some other factor outweighs this factor, but it's never

2    approached that way.  I am approaching it the way I see it,

3    the way the statute says consider it.  I have considered it.

4    To be honest with you, I don't think that there is enough

5    data.

6            Having said that, to the extent that I have gone

7    through every single case that has been brought to my

8    attention, and I have done so, going through the docket, the

9    PACER, the public information, to the extent that there was an

10   appeal, the appellate opinions and decisions with respect to

11   those cases, I don't find that there is a poster boy for this

12   case that is out there.  And even if there were, one or

13   two cases does not make a sweet spot that this Court must

14   match or be near or be influenced by.  It just is not that

15   simple.

16           MS. MARTINEZ:  The Government agrees, Your Honor.

17   Moving on to personal history and characteristics, another

18   3553 factor that the Court must consider.  Your Honor, defense

19   counsel has submitted substantial briefing on this issue.

20   They've attached medical records.  They've described in detail

21   trauma that the defendant reports from his childhood.  And

22   that's all appropriate for the Court's consideration and

23   certainly appropriate for defense counsel to do their best to

24   in their view mitigate the conduct here.

25           The Government's view is that the childhood trauma

Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    49
```

 1   and the medical issues bear little, if any, relationship to

 2   why we are here.  They bear little, if any, relationship to

 3   why the defendant made the choices that he did.  And, indeed,

 4   in these voluminous submissions, there's no claim that there's

 5   any sort of expert diagnosis or expert connection or causal

 6   connection between any of the traumas or the medical issues

 7   that the defendant cites and what the defendant did.

 8          There are, however, other personal history and

 9   characteristics that are also appropriate for the Court to

10   consider, and the Government urges the Court to also consider

11   these.  For example, the defendant's long-standing obsession

12   with government agencies and secrets.  That is made clear both

13   by his conduct directly related to this case, the length of

14   time he invested and the effort he invested to obtain

15   employment with NSA, but also by other evidence that was

16   obtained during the search of his residence.  He had amassed a

17   collection of fraudulent government law enforcement agency and

18   intelligence agency credentials and badges in his own name

19   with his own picture that he had created.  He had --

20          THE COURT:  And they're pretty well done.

21          MS. MARTINEZ:  They are concerningly well done, Your

22   Honor.  They are.  He joined a volunteer law enforcement

23   agency and then inflated his title and his role in a way to

24   sort of brag about his connection to law enforcement.  He

25   amassed seals and insignia related to law enforcement agencies

22-cr-0313-RM          Sentencing          04/29/2024    50

1    and intelligence agencies.  He displays them prominently in

2    his home office.  For example, a picture that he took of

3    himself in front of them and submitted to -- and submitted in

4    support of his ability to transfer the cryptocurrency that he

5    was paid into his own name and into U.S. dollars.  He has this

6    obsession with government agencies and secrets, and that is a

7    personal history and characteristic that is directly related

8    and directly tied to the choices that he made to steal top

9    secret national defense information and to betray his country

10   by trying to sell it to an adversary.

11        Another characteristic that is seen throughout things

12   that he did in his life is dishonesty.  You can see it in the

13   fraudulent badges and credentials that he creates.

14        THE COURT:  It drips.

15        MS. MARTINEZ:  It does.

16        THE COURT:  It drips off of everything.  And I'm

17   saying this for the benefit of Mr. Kraut.  I don't even know

18   what to believe from what you're going to tell me about his

19   background, so to the extent that some of it is simply related

20   to him, there is some degree to which I wonder whether it is

21   also overstated.  I can't tell.

22        MS. MARTINEZ:  The Government agrees, Your Honor.  To

23   the extent that the defendant relies on information that he is

24   submitting without corroboration in an attempt to mitigate his

25   sentence, the Government would urge the Court to take any

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    51

1   information from the defendant -- not defense counsel -- from

2   the defendant with a grain of salt, because he has made clear

3   throughout his history of this case and prior to his direct

4   involvement with NSA that he has this need to self-aggrandize

5   and that he lies, that he is dishonest, that he falsely

6   inflates information, that he states things that are not true.

7          And those -- those personal history and

8   characteristics, those are directly related to why we are here

9   today, and the Court would -- the Government would urge the

10  Court to consider not just the childhood trauma and the

11  medical issues, which, again, largely come from the defendant

12  himself and form no even alleged causal connection to why we

13  are here, to consider those, but also to weigh the things that

14  really relate to the conduct that the defendant engaged in

15  that brought us all here today.

16         Your Honor, the final 3553(a) factor that I will

17  address is deterrence, and I know defense counsel has a lot to

18  say about the value of deterrence.  There are two pieces of

19  deterrence here.  One is deterring the defendant himself,

20  stopping him from committing additional crimes.  And the

21  reality is that while he is incarcerated, it will be much more

22  difficult, perhaps not impossible, but much more difficult for

23  him to engage in conduct anything like what brought us here

24  today.

25         And the Government submits that one reason of many

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing           04/29/2024    52

1    that a sentence of 262 months is justified in the Government's

2    view is that it is reasonable.  It is not a greater sentence

3    than necessary to incarcerate him until he can longer be

4    reasonably expected to cause exceptionally grave damage to the

5    national security of the United States should he retain any of

6    this information that he previously held.

7           But more importantly, Your Honor, setting aside

8    deterring Mr. Dalke, the Government urges the Court to send a

9    message.  Whatever sentence Your Honor imposes today, it will

10   be read, it will be known, it will be discussed by thousands

11   of clearance holders in the intelligence community, in other

12   government agencies, and otherwise.  And the vast majority of

13   those clearance holders will be disgusted by the defendant's

14   conduct.

15          But should there be one out there like Mr. Dalke who

16   has in his or her or their mind a get-rich-quick scheme, a way

17   to double your salary with just a few documents, this Court

18   should send a message that taking that kind of action will be

19   met with an exceptionally -- with an extreme punishment, and

20   it will be resolved quickly.  That message is also important

21   to our foreign adversaries, because while in this case we are

22   all fortunate that Mr. Dalke was not speaking to a true

23   foreign adversary, to a true foreign agent, we all know that

24   those cases happen, and our adversaries look for weak links

25   within the intelligence communities.  And a strong sentence

22-cr-0313-RM           Sentencing           04/29/2024    53

1   will send a message that we will find those individuals, and

2   courts will punish those individuals, and perhaps will stop

3   this kind of action in the future from actually causing

4   exceptionally grave damage to the national security of our

5   United States.  Thank you.

6           THE COURT:  Thank you.

7           Mr. Kraut.

8           And I understand that it's a marathon, so if anyone

9   feels that they're going to pass out because they haven't been

10  given enough time to eat, you let me know, and I will give you

11  my sympathies and require you to continue.

12          MR. KRAUT:  I expect no less.

13          THE COURT:  Go ahead.

14          MR. KRAUT:  Your Honor, this is an extremely serious

15  case, and a 168-month case for someone with no criminal

16  history is an extremely serious sentence.  Of all the

17  Government recited in its pleadings and again today regarding

18  the facts of this case, the one fact that they consistently

19  step over is that there was no damage to the United States or

20  a benefit to a foreign nation that resulted from Mr. Dalke's

21  conduct.  There was no actual damage, other than perhaps the

22  use of resources that are designed and funded for the exact

23  purpose that they worked.

24          THE COURT:  And that is because --

25          MR. KRAUT:  Of the Government -- of the FBI's --

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   54

1          THE COURT:  -- he wasn't talking to a real government

2     agent.

3          MR. KRAUT:  Because he wasn't talking to a real

4     government agent.  Now, is that something that was in

5     Mr. Dalke's mind and should somehow mitigate his actions

6     because he was aware of it at the time?  No.  That's not the

7     argument.  We recognize that in the e-mails and for all the

8     reasons Ms. Martinez stated, this is an aggravated case

9     because Mr. Dalke attempted and intended to do something that

10    is extraordinarily serious.  We accept all of that.

11         But results matter in criminal sentencing.  There's

12    no way around it.  The statutes are written that way.  The

13    guidelines are written that way.  Everywhere you look in the

14    guideline book and in the statute book there's an increase or

15    an adjustment when the results are something other than what

16    the defendant anticipated, planned, wanted and expected.  Here

17    --

18         THE COURT:  Not true.

19         MR. KRAUT:  Well, in many cases.

20         THE COURT:  Frequently true.  Most often true.  But

21    2M3.1 applies regardless of whether it is successful or not.

22         MR. KRAUT:  Exactly.  And that is one of the reasons

23    why we believe the Court should not put excessive weight into

24    the guideline calculation in this case.  It's not to say the

25    guidelines don't matter or the guidelines are pulled out of

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    55

1    thin air.  But when we have a guideline that encompasses such

2    a wide range of potential conduct and then ignores the result

3    of that conduct, the Court must look deeper into the facts of

4    the case, and, I would submit, some comparator cases to assess

5    where -- how much weight to put on the fact that this was only

6    an attempt.  Again, it's not Mr. Dalke deserves credit for the

7    FBI caught him.

8              THE COURT:  Yeah, it is.  Let's call it what it is.

9    Basically he got lucky -- and unlucky -- more unlucky than

10   lucky -- by getting caught, but having been unlucky and gotten

11   caught, he now stands before me and says, well, the harm that

12   I could have caused, would have caused, intended to cause,

13   some of the above, none of the above, it didn't actually

14   happen, so therefore I should get a lesser sentence.

15             MR. KRAUT:  Yes.

16             THE COURT:  And there is some reasoning to that,

17   because obviously throughout criminal law there are instances

18   where attempts are treated less severely than completed

19   crimes.  In most instances where you make that distinction, it

20   is because the attempt requires only something like a

21   substantial step.  Meaning, I don't know, let's say, he -- I

22   don't know -- bought a special Wi-Fi stealer or whatever we

23   want to call it.  Let's invent the thing.  And that's it.  It

24   never went any further.  He got caught then, and we don't know

25   really what happened thereafter.

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    56

1        Here, every single thing that he could have done he

2    did.  Every single thing he could have done to bring about the

3    harm, he did.  Why am I now to say, well, because he wasn't

4    successful, I should give him less than what I would have

5    given him had he been successful.

6        MR. KRAUT:  Well, I certainly believe the Court

7    should -- and I would expect the Government would even agree

8    with this -- that the Court should give him a lesser sentence

9    than it would had he been successful, because a component of

10   determining the sentence must be the actual harm caused.

11       THE COURT:  It's there.  It's a component.  You're

12   right, it's a component.  But, I mean, it doesn't mean that

13   one -- I mean, they could both be worth life.  That's what I'm

14   telling you.  I mean, it doesn't have to be the case that

15   every calculation comes out to where, you know, because I was

16   dealing with an agent, therefore, I get a number that is

17   measurably different than the guy who was dealing with

18   Vladimir.  It doesn't have to be that way.

19       MR. KRAUT:  I agree it doesn't have to be.  The law

20   doesn't say it has to be.  The guidelines doesn't say it has

21   to be.  There's a lot of discretion in this area, and this is

22   pretty wide open to the Court, so I'm not saying the Court's

23   hands are tied.  However, the lack of actual damage caused, in

24   my view of reading 3553, must be one factor the Court

25   considers.  The Government and perhaps even the Court --

                    Sarah K. Mitchell, RPR, CRR

1          THE COURT:  Fair enough.

2          MR. KRAUT:  -- doesn't think it should carry much

3    weight.  We think it should.  And one of the reasons we think

4    it should is because in reverse we so often find ourselves

5    battling against very high sentences for unintended

6    consequences of crimes, and so here we have what we believe is

7    the reverse.  There was --

8          THE COURT:  What was unintended here?

9          MR. KRAUT:  Nothing.  We're saying this is the

10   opposite of that situation.  Too often we find ourselves with

11   a client that's facing a lengthy prison term because something

12   happened that he or she maybe should have foreseen but didn't.

13   In the drug context we see this all the time.  In this

14   particular case we have the opposite, and we think the same

15   logic should apply to Mr. Dalke's benefit.  There should be

16   some measure of mitigating value assigned to the fact that no

17   actual damages occurred.  How much we would concede is up to

18   the Court.

19         THE COURT:  It absolutely is part of the nature of

20   the circumstances of the offense.

21         MR. KRAUT:  Understood.

22         THE COURT:  And as I've told you, and I can't say or

23   won't say more than that, I don't necessarily agree with the

24   precise valuation that the Government places on it, but our

25   disagreements are not major.

                      Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM              Sentencing           04/29/2024    58
```

1       MR. KRAUT:  Understood.  I will then move to

2   highlight some of our arguments relating to Mr. Dalke's

3   history and characteristics, and I'll do so with eyes wide

4   open to the Court's view of information that has not or cannot

5   be verified that comes originally from Mr. Dalke.  I hear the

6   Court loud and clear.  But that is why we endeavored to

7   provide the Court with records and interview memos that

8   support almost everything that we can convey about Mr. Dalke's

9   personal history and background.  Yes, there are certain

10  aspects of his background that are presented as traumas.

11      THE COURT:  That's not the reason for my smile.  My

12  smile is you don't give releases to probation so they can go

13  and gather the records.  You give me those records you want me

14  to see.  It may be that I would be more comfortable if I had

15  all of them, but maybe I wouldn't.

16      MR. KRAUT:  I understand, Your Honor.  The bottom

17  line is the records establish the following really beyond

18  dispute.  He has suffered traumatic brain injuries.  How many

19  --

20      THE COURT:  I do not agree with that.

21      MR. KRAUT:  Well --

22      THE COURT:  I mean, you throw the term around.  It's

23  an impressive term.  He fell off a trampoline.  All right.

24      MR. KRAUT:  Right.

25      THE COURT:  And he banged the side of his head, and

```
22-cr-0313-RM          Sentencing          04/29/2024    59
```

1   I've got records that you've given me where the

2   characterization has been any number of things.  It's been

3   concussion.  It's been that he actually has migraines.  He's

4   got a migraine condition, not a traumatic brain injury.

5   There's one -- and I don't have the medical term, and I'm not

6   going to dig through the 900 pages in my binder to find it,

7   but in one of the doctor's reports, one of the early ones, it

8   is characterized as possibly -- and there is a term that the

9   doctor used to mean that these headaches may be the result of

10  stress or emotional components as opposed to a physical injury

11  component.

12          But yet you consistently come up with the term

13  traumatic brain injury.  Where -- show me the document that

14  says traumatic brain injury, because I didn't really see that

15  term.  And then what I get is he fell off a stretcher in the

16  military and suffered additional traumatic brain injuries, and

17  there's nothing that supports that.  He had some degree of

18  concussion or head injury.  I give you that.  He has some

19  migraine conditions.  I give you that.  Building it up into

20  some kind of damaged individual I don't accept, because it's

21  not right.

22          MR. KRAUT:  Well, here's what the records make very

23  clear.  From an early age he has had repeated scans of his

24  brain that have always found the same abnormality.  I don't

25  argue to the Court that that is a result of a traumatic brain

```
22-cr-0313-RM              Sentencing           04/29/2024    60
```

 1    injury.  We have two separate aspects --

 2            THE COURT:  That's some kind of fatty tissue, some

 3    kind of a mass.

 4            MR. KRAUT:  Yes, a dermoid mass.

 5            THE COURT:  Right.

 6            MR. KRAUT:  It has been seen over and over again by

 7    multiple different doctors and multiple different scans.

 8            THE COURT:  Every one has said neurologically he's

 9    normal.  In terms of his ability to interact, to go to school,

10    et cetera, he's normal.  It's there.  It shouldn't be.  It's

11    an abnormality of brain physiology in the sense of there's

12    something in there that shouldn't be in there, but no one has

13    said that because of it anything has happened.

14            MR. KRAUT:  Yes, I grant the Court that.  However,

15    the records do make very clear that he has repeatedly gone to

16    seek medical attention from a very early age really through

17    the present even at jail for migraines, as the Court points

18    out.

19            THE COURT:  Right.  He's got migraines.

20            MR. KRAUT:  And we see in the records as well the

21    paraganglioma, okay, which we can get to when we talk a little

22    bit about prison conditions and his vulnerability in prison,

23    but he has that as well.

24            THE COURT:  Might as well deal with it now.

25            MR. KRAUT:  It's a very unusual condition.  It

                        Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    61
```

1   affects his endocrine system.

2          THE COURT:  And he is susceptible to throwing off

3   high degrees of adrenaline and things like that that may cause

4   lightheadedness or fainting, stress, anxiety.  I give you

5   that.  Okay.

6          MR. KRAUT:  Right.  The interviews with his parents,

7   as well as some of the medical records do support and convey

8   that he grew up in a household that was for the first six

9   years of his life filled with discord, violence, and then

10  later involved him coming face-to-face with his mother's

11  severe substance abuse problem repeatedly, and that happened

12  at a very early age as well.

13         THE COURT:  He's 30.

14         MR. KRAUT:  I understand, and I have had this

15  conversation with this Court too many times to know that I

16  don't need to dwell on it.

17         THE COURT:  Right.  I mean, I'm more moved by that if

18  you're 18 than I am if you're 30.

19         MR. KRAUT:  Right.

20         THE COURT:  And I'm almost not moved at all if you're

21  60, but, yeah, I hear it.  Daddy spanked me.

22         MR. KRAUT:  Well, this is --

23         THE COURT:  This is more than that.  I don't mean to

24  be minimal, but I'm trying to -- lots of things that happen

25  should not have happened.

                    Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM            Sentencing        04/29/2024    62
```

1            MR. KRAUT:  Right.

2            THE COURT:  I give you that.

3            MR. KRAUT:  Right.

4            THE COURT:  How does it translate to something beyond

5    the broad notion that those of us that have unfortunate

6    upbringings should receive a lesser sentence as a matter of

7    reflexive sentencing.  That's really what it is.  If I name

8    five things and check a box, you know, drug abuse in my

9    household, violence in my household, therefore, I get -- I

10   don't know what.

11           MR. KRAUT:  To be honest with Your Honor, I sort of

12   wish the day would arrive when the entire judiciary does

13   become reflexive about this information, because it does

14   matter so much.  I wish it was reflexive, but instead --

15           THE COURT:  Not today.

16           MR. KRAUT:  It's not in this courtroom, and I get

17   that, so I will attempt to explain again, you know, mitigating

18   information that should result in --

19           THE COURT:  Give me one second.

20       (Pause in the proceedings.)

21           MR. KRAUT:  I can take a break now.  I don't need to

22   --

23           THE COURT:  No.  Let's finish this piece.

24           MR. KRAUT:  Okay.  The way that children develop is

25   affected tremendously by their biology and their surroundings.

```
22-cr-0313-RM          Sentencing          04/29/2024   63
```

 1          THE COURT:  Correct.

 2          MR. KRAUT:  Mr. Dalke's surroundings as a young child

 3    were chaotic at best.

 4          THE COURT:  Correct.

 5          MR. KRAUT:  Traumatic, I would submit to the Court.

 6          THE COURT:  In some ways.

 7          MR. KRAUT:  Research has repeatedly shown that when a

 8    child especially between the ages of about 2 to 7 experiences

 9    repeated traumatic and chaotic environments or exposures, it

10    changes the way their brain developments.  That brain

11    development continues on as they grow older.  People later on

12    in their life bear the scars of their early childhood trauma

13    because their brain changes when that trauma occurs.  As their

14    brain changes and they continue to grow, we repeatedly see

15    research studies showing that adults who have experienced

16    either domestic violence in the home, violence in the home,

17    exposure to substance abuse, all of which Mr. Dalke

18    experienced as a young child, struggle with impulse control,

19    struggle to use what we --

20          THE COURT:  There's nothing impulsive about this

21    crime.

22          MR. KRAUT:  I agree it took place over a period of

23    three months.  Here's what I'll say.  The research also shows

24    that they engage in acts that you and I would consider to be

25    reflective of very poor judgment, and certainly this crime

```
22-cr-0313-RM          Sentencing          04/29/2024    64
```

1   reflects that, okay?

2          THE COURT:  I give you that, and we're talking

3   generically about research.  It creates certain correlations,

4   but it does not say -- it does not say that everyone who

5   experiences X in the future will do Y.

6          MR. KRAUT:  No, it does not.  It's much more subtle

7   than that.

8          THE COURT:  It does not say that everyone who

9   experiences X is compelled to do Y.  They can't help

10  themselves.

11         MR. KRAUT:  No, absolutely not.  What these traumatic

12  events do when they occur in childhood and continue throughout

13  adolescence --

14         THE COURT:  You're better off without them.  I give

15  you that.

16         MR. KRAUT:  We're all much better off without them.

17  What they do is they have been scientifically shown to

18  increase the risk that a person will engage in dangerous

19  behavior or violence or criminal conduct.

20         THE COURT:  And therefore I understand that what?

21  That he's at increased risk of continuing to do it if I

22  release him early?

23         MR. KRAUT:  No.  It's not --

24         THE COURT:  Why not?  Why not?

25         MR. KRAUT:  -- that he's damaged goods forever and he

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    65

1    has to be locked away.

2            THE COURT:  Only up to the point of sentencing?

3            MR. KRAUT:  No.  What the DOJ research on juveniles

4    has repeatedly shown and we've cited to this Court is that

5    protective factors make a huge difference, is that when you

6    take a child who has all of these same risk factors that

7    Mr. Dalke was exposed to, and you place them in an environment

8    where there are protective factors, consistent parenting,

9    consistent attachments to teachers, to mentors, consistent

10   access to treatment for some of the traumas they've endured,

11   that much of the damage done by that early life trauma can be

12   undone.

13           THE COURT:  What in his life was impeded, impaired,

14   crippled, injured, by the things that you and I are talking

15   about without being overly --

16           MR. KRAUT:  Specific.

17           THE COURT:  -- specific?  I mean, you know, he

18   graduated, got a degree from college, has friends, been

19   married twice, joined the military.  So what is it, that this

20   only pops up in his life when he decides he's going to sell

21   top secrets, and then all of a sudden it's an impulse that

22   stems from something that happened when he was five?

23           MR. KRAUT:  Your Honor, the accomplishments that

24   you've just rattled off reflect Mr. Dalke's remarkable

25   dedication to pursuing success in the face of these obstacles

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   66

1    in front of him.  He graduated from high school at 18 after

2    leaving home at 16.  He was homeless for the last two years of

3    high school.  It's amazing he graduated.  I can't imagine

4    having finished high school had I gone through what he went

5    through and had no home for the last two years of high school.

6    It's crazy to think about.  He gets married.  How does that

7    marriage end?  Following a miscarriage, he and his wife

8    essentially drift apart.  He goes to the military, and she

9    moves on.  That's not a successful marriage.  That doesn't

10   reflect a successful life outcome for someone who experienced

11   trauma at a young age.

12          THE COURT:  And then he had another wife.

13          MR. KRAUT:  And then he had a wife who because of

14   this case --

15          THE COURT:  Because of this case, it fell apart.

16          MR. KRAUT:  Yes.  And that's another trauma that he

17   will deal with moving forward, but it's certainly a tragedy in

18   his life.  But the fact that he, you know, was married once at

19   an early age before he went to the Army doesn't mean he just

20   somehow --

21          THE COURT:  He's not damaged goods.  If you want me

22   to believe he's damaged goods, then stop telling me about some

23   research study and blah, blah, blah.  Show me in his life

24   indicia of damaged goods apart from this.  That's the problem.

25   When I look, I don't see it.  I don't see it in relationships.

Sarah K. Mitchell, RPR, CRR

```
         22-cr-0313-RM          Sentencing          04/29/2024   67
```

 1   I don't see it in jobs.  I don't see it in ambition.  I don't

 2   see it in ability.  I don't see it.  But yet -- I mean, look,

 3   if he's got definable conditions, fine.  We can talk about it.

 4   But right now all we've got is 20 years ago bad stuff

 5   happened.  Cut his sentence now.

 6          MR. KRAUT:  No.  The evidence for the continued

 7   impact of the trauma that Mr. Dalke endured as a child --

 8          THE COURT:  What evidence?

 9          MR. KRAUT:  -- is throughout his life.

10          THE COURT:  What evidence as to him do you have?  You

11   have no one.  Not even -- now, I don't, frankly, get terribly

12   impressed with social workers, but I don't have a social

13   worker.  I don't have a psychiatrist.  I don't have a

14   psychologist.  I don't have a doctor.  I don't have one of

15   these study authors.  All I've got is a recitation of where

16   things went bad.  You and I could come up with a list of

17   things that happened that weren't really good in our

18   childhoods, but that's all I've got is a list.

19          And somehow 25 years later or 20 years later, he

20   steals top secret information and tries to sell it to the

21   Russians, and there's a correlation, because it's the same

22   brain -- I mean, it affects him as a person.  I give you that.

23   But I'm judging the person who is here now, and I'm looking

24   for explanations for the crime, and I don't have any.  But

25   you're right.  It is also the case that I look at his history

```
22-cr-0313-RM              Sentencing          04/29/2024    68
```

 1  and characteristics.

 2          MR. KRAUT:  Right.

 3          THE COURT:  And those are to be considered as well.

 4  They're just stronger considerations when there's a

 5  correlation.  That's all I'm saying.

 6          MR. KRAUT:  I hear -- I hear the Court, but

 7  mitigation does not need to be tied to the offense of

 8  conviction or the offense in general.

 9          THE COURT:  No.

10          MR. KRAUT:  But it's stronger when it is.  I hear the

11  Court on that.  First of all, I know that this comes from

12  Mr. Dalke, but you see in the PSR four suicide attempts in

13  early adolescence.

14          THE COURT:  He says.

15          MR. KRAUT:  I knew that's what you would say.

16          THE COURT:  I don't have a single doctor's -- I would

17  think that, you know, if the kid is committing suicide or

18  trying to commit suicide, he might try to go to a hospital.

19  And I would think that since you have access to hospital

20  records, I might see such a record, but I don't.

21          MR. KRAUT:  We then see that before he joins the

22  Army, he really is unable to hold down any meaningful

23  advancement-opportunity type job.  He works in a department

24  store.  He works for the VA hospital in Arizona for a little

25  while.

22-cr-0313-RM            Sentencing        04/29/2024   69

1              THE COURT:  So do plenty of people.

2              MR. KRAUT:  Yes.  But you're saying look at his life,

3    it looks so successful.  It doesn't look so successful.

4              THE COURT:  I'm not going to sit there and say that

5    people who have jobs that millions of people do every day is

6    not -- somehow not successful.

7              MR. KRAUT:  He declares bankruptcy shortly after the

8    stint in the military.  His military stint was cut short by

9    health issues.

10             THE COURT:  His military stint was not cut short due

11   to any behavioral problem.  It is cut short due to a condition

12   not amounting to a disability that has to do with that aortic

13   --

14             MR. KRAUT:  Paraganglioma.

15             THE COURT:  Yeah, that we talked about earlier.  And

16   interestingly -- interestingly, you move from getting the

17   benefit of the government by military to getting the benefit

18   of the government by bankruptcy to getting the benefit of the

19   government by social security disability, and I'm not quite

20   sure how that happened either, because his military -- his

21   DD214 says condition not disability, but whatever.  And after

22   all of this drinking at the government trough, you turn around

23   and betray it, and it's because life was hard when we were

24   young.

25             MR. KRAUT:  No.  If I had an explanation for the

                     Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    70
```

 1    crime that was as clean and crisp as what the Court is looking

 2    for, it would have been in the pleadings.

 3              THE COURT:  I would accept muddy and sloppy.  You got

 4    nothing.  It's not that it's not clean.  It's that there's

 5    nothing.

 6              MR. KRAUT:  When I hear the Government argue that

 7    Mr. Dalke's crime was the continuation of a lifelong obsession

 8    with law enforcement and the intelligence community, and that

 9    is an aggravator, what I interpret, what I hear, knowing him

10    and knowing his past, which I do believe includes the traumas

11    that he has reported, okay, I believe him --

12              THE COURT:  I believe that you believe.

13              MR. KRAUT:  Okay.  What I hear when the Government

14    makes that argument is where does that obsession come from?

15    Why is he so interested in the intelligence community and the

16    military?  Because that was the only bright spot in his

17    childhood was going with his father to see the parked Navy

18    destroyers for the father-and-son sleepover night that we

19    talked about in our pleadings.  That he very quickly looked to

20    the United States military for both a refuge for himself in

21    the moment and a hope for the future.

22              That's where that obsession comes from.  It's not

23    nefarious.  He wasn't a nefarious nine-year-old dressing up in

24    fatigues and climbing on his roof.  He was a kid looking for

25    an escape, and in reality that is still in him today.  There

22-cr-0313-RM          Sentencing          04/29/2024   71

1    is still a very damaged child inside this 32-year-old man who

2    is looking to escape his own inner torment, for lack of a

3    better term.  I know the Court doesn't like that argument.

4    I'm not saying he should be sentenced like a child.  I'm not

5    saying that.

6              THE COURT:  It's not I don't like it.  It's that I

7    struggle.  He looks to this embrace of the government as

8    hopeful, as to something to be sought, to something to run to,

9    a place that's warm, a place that's safe.

10             MR. KRAUT:  It reminds him of --

11             THE COURT:  So why betray it?

12             MR. KRAUT:  I don't have a clean answer to that

13   question.  I don't think the Government knows.  I don't have a

14   very clear answer on why he committed this crime.  But what I

15   do know is that he did not do so with the benefit of a healthy

16   background, secure parental attachments, a consistent

17   adolescence of success and mentorship that so many people need

18   and receive.  He didn't commit this crime after having the

19   benefit of the protective factors that the DOJ has identified

20   as counteracting the risks he had.  That's what I know.

21             Can I say he committed this crime because of his

22   mother's addiction?  No, I'm not saying that, and I can't say

23   that, and I don't expect the Court to believe that.  But what

24   we do know is we can piece together, maybe loosely, but as

25   best we can, that this was a person who as a child faced

22-cr-0313-RM          Sentencing          04/29/2024    72

1  extreme obstacles, did not receive treatment for those

2  obstacles, retreated largely into a world of fantasy related

3  to being a spy, related to working for the government, and

4  maybe some of that was in video games, maybe in novels, maybe

5  in movies, maybe in his own head.

6         All of that was there for him, and it continued as he

7  grew, and it ultimately resulted in terrible judgment.  That

8  terrible judgment is, lo and behold, consistent with research

9  on --

10         THE COURT:  The judgment is good in terms of

11  finishing school.  The judgment is great, it's exceptional

12  beyond what you would have been able to do.  The judgment is

13  good in terms of getting a job.  The judgment is good in terms

14  of joining the military for the warmth, the comfort, whatever

15  that the military provides.  The judgment is good in taking

16  care of your credit and your difficulty with your financial

17  circumstances by going through bankruptcy.  The judgment is

18  good in applying for a job.  The judgment is good in being

19  able to sell yourself as able to perform that job.  The

20  judgment is good in being able to volunteer to assist law

21  enforcement in the Colorado Rangers or whatever it is.

22         The judgment is good all the way through this, and

23  now we have what, a hiccup?  That somehow should be understood

24  as the product of this background that did not seem to inhibit

25  the judgment all the way up to this point.  It's just a tough

22-cr-0313-RM            Sentencing          04/29/2024    73

1    swallow.

2         MR. KRAUT:  The aspects of Mr. Dalke's history that

3    the Court has highlighted I believe unfairly portray him as

4    sailing through life when the opposite has been true.  He has

5    struggled.  He achieved those things in spite of his

6    struggles.

7         THE COURT:  I didn't say he sailed.

8         MR. KRAUT:  The Court's listing all of these things

9    that he did and --

10        THE COURT:  He is able to conform.

11        MR. KRAUT:  He is.

12        THE COURT:  Whether he struggles, it's hard, it's

13   easy, he is able to conform.  He has no record.  He knows

14   where the line between lawful and unlawful is.

15        MR. KRAUT:  We would be talking about insanity if he

16   didn't.  I agree with you that Mr. Dalke has the ability and

17   the knowledge and the brain power to do well in certain

18   aspects of his life, and he has, but there's another side to

19   Mr. Dalke that has plagued him and continues to plague him.

20   We see him doing much better recently in the jail.  I think

21   the best example of this is in the last 19 months he's been in

22   the SHU he improved, I think, dramatically after the jail

23   started giving him an antidepressant.  This is not to say that

24   depression causes espionage.

25        THE COURT:  I would be depressed too if I was locked

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   74

1    up in the SHU.

2         MR. KRAUT:  Exactly.  But he had more issues before

3    he was arrested, and some of the lack of records on this are

4    that he wasn't getting the help he needed when he needed it.

5    Unfortunately, it took this case to open his eyes to some of

6    his -- the issues that he carries with him into adulthood, but

7    it has helped.  He has talked extensively with our social

8    worker.  He has talked with some folks at the jail.  He's now

9    taking an antidepressant, and he's much more stable than he

10   was when this was going.

11        It's a very confusing crime.  I don't have a clear

12   explanation for why he did this after, yes, he has shown the

13   ability to exercise sound judgment in some aspects of his

14   life.  He exercised terrible judgment in this aspect of his

15   life.  If I sat up here and tried to explain in a way that

16   made logical sense, I would get nowhere.  This crime doesn't

17   make logical sense.  He had the job of his dreams.  He was

18   married to a woman that he loved.  And he was moving forward

19   in a positive way.  And he threw it all away.  He sabotaged

20   his own success.

21        Now, I could get into armchair psychology about why

22   people might do that, but I don't think that's going to be

23   beneficial to the Court.  At the end of the day, instead what

24   we are focused on are the records that show a consistent

25   seeking out of treatment for migraines.  Something is not

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    75

1   right with his brain physiology.  It's unclear exactly how it

2   affects his brain function.

3          THE COURT:  It's not unclear.  You take things, and

4   you put your spin on them and expect me to buy it.  It's not

5   unclear.  What is clear is he has a mass and no one has

6   attributed that in any way to any type of disability,

7   inability, impact, ability to function, neurological scoring,

8   or anything else.  It's there.  Now, you can say to me, well,

9   his brain had something that, you know, yours and mine

10  doesn't.  Okay.  My big toe has something that yours and his

11  doesn't.

12         The fact that there are differences does not mean

13  what you want me to say it means.  It does not mean that he is

14  somehow damaged goods.  It means he has something there.

15  Okay.  I give it to you.  He has something there.  Not a

16  single person has said that one aspect, any aspect of his

17  judgment, behavior, conduct, success, or failure is in any way

18  related to that mass.  No one.  Except you.

19         MR. KRAUT:  Or the extensive trauma that he

20  experienced or the difficulties he experienced in childhood.

21  That's true.  Often as happens in criminal cases we don't have

22  something to look at closely until it's too late.  He was

23  essentially functioning in a way that didn't require a great

24  deal of investigation into the functioning of his brain up

25  until this happened, and now this happens, and we take a

Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    76
```

1    different look.  Maybe hindsight is more beneficial than what

2    was available at the time.

3              THE COURT:  So who do you have since this happened

4    that says it matters any more than the color of his hair?  No

5    one.

6              MR. KRAUT:  The research --

7              THE COURT:  Even a study.  I'll take the study.  No

8    one.

9              MR. KRAUT:  We cited several studies in the pleadings

10   --

11             THE COURT:  That say that these things exist.

12             MR. KRAUT:  And that they're associated with

13   functional deficits, deficits in impulse control,

14   decision-making, executive functioning.

15             THE COURT:  They can be.  Now, show me his

16   decision-making other than this, and it's like what are we

17   talking about here?

18             MR. KRAUT:  That's -- that exacting, that demanding

19   of a standard could never be met.  There is no MRI.  There's

20   no test that can say, oh, this decision you made on

21   September 27th, '22 was because of this --

22             THE COURT:  Sure, but there's indicia.

23             MR. KRAUT:  That's what we're looking at.

24             THE COURT:  Where's the indicia here?

25             MR. KRAUT:  His --

22-cr-0313-RM                Sentencing            04/29/2024      77

1      THE COURT:  Where's the rest of it that suggests that

2  somehow there's a damage to a compromised brain?  Where is it?

3  I don't see it.

4      MR. KRAUT:  As I said before, I think that the

5  difficulties in maintaining jobs other than the brief job he

6  had in the military for about two years --

7      THE COURT:  All 18-year-olds have difficulty

8  maintaining jobs.  The first couple of jobs that people get

9  they swap off.  There's nothing unusual about his life in that

10  respect.  He didn't get fired.  You're not telling me that.

11  He changed jobs.  Okay.

12      MR. KRAUT:  Right.  I do think the failed marriages

13  is indicative of some functional deficit.  There's reports in

14  the -- that, again, come from Mr. Dalke and are described in

15  the PSR of impulsive behaviors that would seem

16  counterintuitive or against his own interest.  Taking objects

17  while he was in the military that didn't belong to him.  You

18  know, small --

19      THE COURT:  Come on.  Office supplies.  I mean, come

20  on.  I can probably grab half the people in this room for

21  taking pens or pads or something like that from the office.

22      MR. KRAUT:  There's a --

23      THE COURT:  Might even have to turn myself in to the

24  marshals.

25      MR. KRAUT:  Mr. Dalke's life has not been the success

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    78

1    story that the Court has painted.

2           THE COURT:  I'm not saying it's a success story.  I'm

3    saying it is human, mainstream, ordinary.  Some things are

4    good.  Some things are bad.  It's life.  But there's nothing,

5    nothing about it that sets him apart from others in a way that

6    even comes close to explaining to me why he should get

7    168 months as opposed to what the Government is asking.

8           MR. KRAUT:  One of the big things that led me to be

9    suspicious --

10          THE COURT:  Or anywhere in between.

11          MR. KRAUT:  One of the major things about his

12   personal background that has caused me to suspect that his

13   trauma and whatever is happening in his brain has had an

14   impact on him is the consistent migraines.  And I grant you

15   that we don't have a neurologist here to say his migraines are

16   caused by this mass, and that, oh, by the way, that also

17   affects his judgment.  We don't have this puzzle perfectly

18   created for the Court as the Court seems to require.  Instead,

19   we have each of these different pieces.  I think migraines are

20   a piece of the puzzle.

21          Yes, many people have migraines and don't commit

22   espionage.  Obviously.  But Mr. Dalke is -- the focus is on

23   him, and when we look at his life history, including his

24   health history, we do see certain abnormalities and functional

25   deficits.  If the Court wants to view it a different way,

```
         22-cr-0313-RM          Sentencing          04/29/2024    79
```

 1   you'll see it a different way.  But it's clear to me that

 2   Mr. Dalke carries the scars of his trauma with him and that

 3   affected his decisions in this case.

 4        THE COURT:  Let's take five for my court reporter,

 5   and we'll come back.  Literally just five.

 6        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

 7      (Break was taken from 1:48 p.m. to 1:54 p.m.)

 8        THE COURT:  Mr. Kraut, back to you.

 9        MR. KRAUT:  Thank you very much, Your Honor.  There

10   are other 3553(a) factors, of course, I'd like to address.

11   They include obviously that Mr. Dalke has no criminal history.

12   Not much else to say about that.  Also, it is our position

13   that Mr. Dalke is genuinely remorseful for his conduct.  He

14   will address the Court.  I hope the Court hears that.  I know

15   the Court has expressed skepticism about Mr. Dalke's character

16   for truthfulness.

17        THE COURT:  Credibility.

18        MR. KRAUT:  Credibility.  I understand that.

19   However, if we look just to Mr. Dalke's actions, I do think --

20   in this case since being arrested, it seems that they do --

21   they are consistent with remorse.  He makes no attempt to

22   escape apprehension at Union Station.

23        THE COURT:  He couldn't have if he wanted to.

24        MR. KRAUT:  But he didn't try.  That's true, but he

25   did not try.  We've seen plenty of people try when it was not

                        Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    80
```

1    a good idea.

2          THE COURT:  Yeah, we have.  We've seen plenty of

3    people try, okay.

4          MR. KRAUT:  He did not do anything like that.  There

5    was a delay obviously that related to counsel obtaining

6    clearances and nothing to do with Mr. Dalke.  Once that hurdle

7    was overcome, he entered a notice of disposition as quickly as

8    a person could in case of this seriousness.  And then, as has

9    been discussed, he earned the 5K2.0 departure twice and is

10   available to do so further in ways that the Government -- that

11   has benefited the Government and continues to do so.

12          So those are not the actions of a remorseless person,

13   and we have seen, unfortunately, examples of defendants in

14   this very context when we look at some of those comparison

15   cases of folks who did not have remorse, were much more

16   ideologically focused and continued to behave in ways that

17   jeopardized the country and ultimately hurt themselves, and we

18   don't see a whiff of that here for Mr. Dalke.

19          We believe that Mr. Dalke does not present a

20   continuing danger to other people in custody.  He has behaved

21   in an exemplary manner over 19 months in the Englewood secure

22   housing unit, which is an extremely deprived environment in

23   which to do time.  He is requesting a Court recommendation to

24   ADX in Florence, which I have never made that recommendation

25   or request before.  I don't know if anyone else has ever

1    presented that to this Court, but it's very unusual.

2          Mr. Dalke essentially is concerned about his

3    vulnerability in prison, and we believe for good reason.  We

4    outlined some of those reasons in the pleadings and believe

5    that is basically the only place he will be safe.  And he

6    recognizes that it is a continued existence of isolation and

7    lack of intellectual stimulation except for books that

8    hopefully he'll be given, but that's his request, and we're

9    passing that along to the Court.

10         THE COURT:  I mean, look, we'll see what happens with

11   that.  I mean, it is a little unusual, I'll give you that.

12   Normally I don't recommend particular places because the BOP

13   has to figure out availability.  It has to figure out any

14   number of other things.  I don't know.  Maybe I'll do it.

15   Maybe I won't.  It's a little -- I'm a little off guard with

16   regard to it.  But certainly to the extent that he is looking

17   to go there for reasons having to do with safety

18   considerations, the BOP should be the ones who make that

19   decision more than me the more I lean into it.

20         MR. KRAUT:  That's true.

21         THE COURT:  Although I understand what you're talking

22   about.  There's things that you're talking about that you and

23   I know that we're not going to talk about in a public context,

24   and I get that.

25         MR. KRAUT:  Right.  If the Court -- let's say if the

22-cr-0313-RM          Sentencing          04/29/2024    82

1    BOP were to place him in that environment, our position is

2    that it would reduce any potential future danger Mr. Dalke

3    poses by virtue of having learned some of the classified

4    information in the case just because it limits communication,

5    it limits his interaction with others.

6              THE COURT:  I get it.

7              MR. KRAUT:  Specific deterrence has been achieved

8    already.  We outlined all the things Mr. Dalke has lost.

9    There is nothing left really for him in his life.  His parents

10   are here today to support him.  They traveled here, which I

11   know he appreciates.  We certainly appreciate as well.  But

12   other than them, he really has no one left in his corner, and

13   so he has been specifically deterred as a person could

14   possibly be.

15             With respect to general deterrence, put quite simply,

16   168 months is enough to achieve general deterrence.  Whether

17   everyone in the NSA reads the transcript of this sentencing or

18   looks at the press release or whatever it is the Government's

19   arguing about what will happen for general deterrence after

20   the fact, that is not a light sentence.  We're not asking for

21   probation.  14 years in federal prison for this young man with

22   no criminal history is an extraordinarily harsh sentence.  It

23   is more than enough to achieve the goal of general deterrence.

24             THE COURT:  You do realize, of course, that it is --

25   this is like the second or third time that you've mentioned no

22-cr-0313-RM          Sentencing          04/29/2024   83

 1   prior record.  He wouldn't likely have gotten the position had

 2   he had a prior record.  Those given top secret clearances tend

 3   not to be people in Criminal History Category VI.

 4         MR. KRAUT:  Almost without exception, that's right.

 5   But he is the person you're sentencing here today, and that is

 6   a fact about his history.

 7         THE COURT:  True.

 8         MR. KRAUT:  A brief word on the guidelines.  And I

 9   know the Court pointed out to Ms. Martinez that there was a

10   gun in the backpack, and for that reason he is not eligible

11   for the --

12         THE COURT:  Zero-point offender.

13         MR. KRAUT:  -- zero-point offender.  Our position on

14   that is potentially in some internal conflict.  On the one

15   hand, we concede that the gun was possessed in connection with

16   the offense.  It was possessed while he was in Union Station.

17   He chose to carry it there.  It was there.  And so for that

18   reason, we're not arguing for that minus two.

19         On the other hand, when we look at the basis for that

20   particular exclusion, there isn't much in the guideline

21   commentary or even in, you know, really anywhere that explains

22   why that minus -- why that exclusion was added when they

23   created 4C1.1, but it does appear that the reasons aren't

24   related to this case or this set of circumstances.  Mr. Dalke

25   didn't use the gun.  He didn't attempt to use the gun.  He

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   84

 1   didn't grab for it as agents closed in on him.  Maybe he

 2   didn't have time, but plenty of people have tried when they

 3   didn't have time, and he didn't.  And he did have a standing

 4   practice of carrying a gun as many people who are former

 5   military do.

 6         He owned it legally.  It wasn't a crime for him to

 7   own it.  He possessed it in a manner that I think is -- can be

 8   described as safe within this context of committing an unsafe

 9   crime.  In other words, he wasn't waving it around or trying

10   to do anything with it to intimidate or frighten anyone else.

11   When we see that every other exclusionary criteria for the

12   zero-point offender does not apply, and it's only that, and

13   that seems to be a relatively tangential or minor aspect of

14   the case, it seems to me that that is a basis for the Court to

15   vary further downward.

16         In addition, the guidelines do not account for the

17   fact that no actual damage occurred.  We've talked about that

18   earlier.  I won't revisit that ground.  With respect to case

19   comparisons, I'm not going to try -- I know we're short on

20   time.  I'm certainly not going to go --

21         THE COURT:  I've got all day.

22         MR. KRAUT:  Well, okay.  You read everything that we

23   submitted, so I don't need to, but I think one of the points

24   of all of these case comparisons is that the guidelines do not

25   appear to be rooted in a going rate.  They don't appear to be

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024     85

1    rooted in evidence about sentencing.  And when you look at the

2    purpose of the sentencing commission, and the way that it set

3    out to create the guidelines back in 1984, the way they did it

4    was to look at what people were getting and then to fashion

5    guidelines that reflect that.

6          And I assume that they did so successfully with

7    respect to the many crimes that are much more common, but for

8    this particular crime, and even the entire 2M chapter, there

9    isn't much evidence that that's what drove those guideline

10   numbers.  The guidelines are what they are in this case, but

11   they don't appear to have been produced by evidence-based

12   research by the commission.  In addition, I think the -- so

13   that's another reason not to rely overly -- not to put too

14   much weight on the guideline range in this case.

15         The other value I think in some of these case

16   comparisons is that we see how unusual Mr. Dalke's case is in

17   a few aspects.  One is his inexperience in the intelligence

18   community.  The vast majority of people sentenced for

19   espionage, whether they were convicted of 794(a) or 793 or one

20   of these other offenses that can be charged in these matters,

21   the vast majority of these people were 15-plus-year law

22   enforcement, military, or intelligence community members.

23         THE COURT:  People who soured over time or had a

24   grudge or something like that.

25         MR. KRAUT:  And people who earned their way up the

22-cr-0313-RM          Sentencing          04/29/2024    86

1    ladder to access a tremendous amount of information and then

2    made the conscious choice to use that to the country's

3    detriment.  People who earned the trust placed in them and

4    acquired a great deal more classified information and

5    classified knowledge than can possibly be attributed to

6    Mr. Dalke.  He was a three-week employee at the NSA.  Why he

7    was given access to such sensitive information at that early

8    stage with what sounds to me to have been no oversight

9    whatsoever for an entry-level employee I don't know.

10            THE COURT:  You know, that's -- that has never gained

11   traction with me.  I'm not saying they did or did not screw up

12   in letting him have access to what he would have access to.

13   If they should have had someone sitting on his shoulder and

14   they didn't, then they didn't.  It does not mean that somehow

15   it's not his fault or that somehow he should get a benefit for

16   that.  If we want to just go around and throw bricks and say

17   the Government screwed this up, okay, maybe they did.  Maybe

18   they didn't.  I don't know.  It's not relevant.

19            MR. KRAUT:  When looking at him, if the Court is

20   inclined to do any type of comparison with some of these other

21   cases, and we look at the type of information he had, it

22   doesn't fit with the amount of time he was in the intelligence

23   community.  That's the point that I'm making.  It's so much

24   that --

25            THE COURT:  I get it, but when you're in the realm of

```
22-cr-0313-RM          Sentencing          04/29/2024    87
```

1   cyber security, it gives you wider, broader access than if

2   you're in the realm of, I don't know, your submarine guy or

3   atomic energy commission guy or whatever it may be.  I give

4   you that he had access to highly sensitive information from

5   very early in his employment.

6           MR. KRAUT:  From -- right.  From immediately in his

7   employment, and compared to many other espionage defendants,

8   he did not have --

9           THE COURT:  How does that mean anything other than

10  you're throwing rocks at the NSA?

11          MR. KRAUT:  It comes back to comparing him to other

12  defendants, which I know --

13          THE COURT:  There's a difference.  Okay.  He's got a

14  beard.  They don't.  What does it have to do with the price of

15  anything?

16          MR. KRAUT:  I believe that other defendants who

17  received sentences far less than what the Government is

18  seeking were more culpable because they abused trust that they

19  developed and earned over lengthy careers in the intelligence

20  community, and he didn't.  That's the point.  This happened

21  very quickly.

22          THE COURT:  Fair enough.  Fair enough.

23          MR. KRAUT:  And then as we look at the comparisons,

24  understanding that the numbers are too small to create a wide

25  data set to really look at a going rate for something like

```
22-cr-0313-RM          Sentencing          04/29/2024   88
```

1   that, we're left with Mr. Dalke -- the unique aspects of

2   Mr. Dalke's case, which are that he pled guilty, didn't go to

3   trial.  He cooperated.  He filed no motions requiring CIPA

4   litigation or requiring the efforts that the Government has to

5   put forth in those areas of these types of cases.  His crime

6   spanned less than three months, and he's engaged in excellent,

7   exemplary conduct in custody since his arrest.  So those

8   factors that all relate to this case are unusual in this area.

9   Yes, there's not that many cases.

10          THE COURT:  Again, you go too far.  Are there people

11  who were sour?  Yes.  Are there people who will not change,

12  who even after being arrested were trying to compound the

13  situation by getting relatives or people on the outside from

14  doing X, Y, Z?  Yes.  Those people are in these cases.  There

15  are also in these cases people who pled guilty, cooperated,

16  frankly, testified against others.  His case is -- it

17  intersects bits and pieces of lots of other cases.  It is by

18  no means unique.

19          MR. KRAUT:  I think the short duration of time that

20  the crime occurred in and the short amount of time that he

21  worked in the intelligence community are extremely unique.

22          THE COURT:  That may be, but it's not necessarily

23  mitigating.  You hit the ground with training.  Frankly, the

24  implication is you went in the door intending to.

25          MR. KRAUT:  And the Government has implied that

                    Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    89
```

1    argument, and as the Court has seen in our pleadings,

2    Mr. Dalke denies that.

3             THE COURT:  Yeah, he does, but --

4             MR. KRAUT:  At the end of the day, Your Honor,

5    168 months --

6             THE COURT:  -- he has CIA ID.  He has NSA ID.  He has

7    -- now, what he does with them I have no idea.  If he puts

8    them under his pillow at night, I don't know.  But why is

9    someone even doing that?  Is it more consistent with someone

10   who went in the door viewing himself as smarter than others,

11   and, you know, he wants to be -- he wants to be WikiLeaks guy.

12   He wants to be the smart guy.  He wants to be the guy that

13   knows better than everybody else.  I don't know.  I don't

14   know.

15            But I can tell you that there is no scenario that I

16   can come up with -- and I have struggled with it -- where

17   you're getting the job of your lifelong dreams, and then for

18   no reason and within a couple of days it suddenly occurs to

19   you, hey, let me betray my country.  Yeah, why not.  That does

20   not compute.

21            MR. KRAUT:  I think that the fraudulent

22   identification documents, badges, things of that nature in the

23   house where he was living are part of -- were a part of this

24   essentially role-playing ongoing fascination with the

25   intelligence community.  I don't see anything in the evidence

22-cr-0313-RM          Sentencing          04/29/2024    90

1    that the Government has provided in classified, or

2    unclassified discovery for that matter, that suggests that

3    those documents were created with intent to break into some

4    facility or commit espionage in some other manner or anything

5    like that.

6          Instead, it looks much more like Mr. Dalke has been

7    interested in this aspect of government and intelligence for

8    many, many years, and enjoyed or got something out of creating

9    these documents and working on them over time.  And they were

10   good.  I agree with the Court.  And it seems that he enjoyed

11   creating them for the sake of creating them.  That he got some

12   either thrill or other positive emotional outcome from --

13          THE COURT:  Being smarter than everybody else.

14          MR. KRAUT:  In those moments that he's creating those

15   badges, perhaps that is what was going on.  It was comforting

16   for him.  It made him feel better about himself.  We could

17   armchair psychologist this all day.  That's what I'm saying.

18   But at the end of the day we don't really know -- neither does

19   the Government, neither does the Court -- exactly what was

20   going on in Mr. Dalke's head.

21          THE COURT:  Yet I have to make the judgment, and what

22   I'm telling you is the judgment is that this is what he

23   planned to do when he walked in the door.  Because the other

24   -- anything to the contrary, that this just kind of popped up,

25   makes absolutely no sense.  None.  Absolutely no sense.

                        Sarah K. Mitchell, RPR, CRR

1          MR. KRAUT:  But --

2          THE COURT:  It's the job of your dream.  My lifelong

3    goal is acquired.  The love of my life, whatever.  And then

4    within days -- so you pull stuff, leave, and then within days

5    of leaving the job you're selling it, and then you're telling

6    the believed-to-be Russian agent, Tell me what you need, I'm

7    going to go back and get more.  You can come up with whatever

8    explanation you want me to consider, and I will consider it.

9    But to me it looks, sounds, feels, smells, and tastes

10   intentional.

11         MR. KRAUT:  So let me answer that with a question.

12   Why leave so quickly?  If the intent all along is to get your

13   foot in the door, get the keys to the kingdom, look at what

14   the NSA has in terms of classified information about

15   everything under the sun, and betray the country, become a

16   spy, sell it to whoever you can sell it to for however much

17   you can sell it for, why bail out after three weeks?  Isn't

18   the logical --

19         THE COURT:  We're going to play the question game.

20   Okay.  Here's the answer.  Since you want me to believe

21   everything that he says, I'll accept him at his word.  His

22   wife was getting surgery, and he needed to be back with her to

23   take care of her post surgery.  He could not do that working

24   from Maryland where he was working with her being in Colorado.

25   He had asked for -- he didn't want to leave -- he asked for

22-cr-0313-RM          Sentencing          04/29/2024    92

1    extended leave.  It was denied because he'd just started and

2    he hadn't earned any kind of a bank of leave time, and he

3    expected to come back.  He was telling them he would reapply.

4          So the answer to your question is that was a hiccup

5    that he left.  It doesn't mean anything, anything, other than

6    he walked in the door intending to do that which he did and

7    told others that he would do it again.

8          MR. KRAUT:  But what does the Court make of the

9    request for nine months of leave to assist a spouse with an

10   ACL reconstruction?  That amount of time does not seem

11   consistent with that surgery and that recovery.  Perhaps there

12   could have been complications.  I'm not saying it's smooth

13   sailing --

14          THE COURT:  Jimmy cracked corn.

15          MR. KRAUT:  The point I'm making is it does not

16   appear that Mr. Dalke was operating with some grand plan from

17   the very beginning.  This instead looks very, I don't know, at

18   times impulsive, at other times planned out, but it's not

19   consistent.  This is not all part --

20          THE COURT:  I don't see any part of it that looks

21   impulsive.  Where's the impulsive piece?

22          MR. KRAUT:  I think working to get this job for over

23   a year and then leaving in three weeks.

24          THE COURT:  That's impulse?

25          MR. KRAUT:  The leaving so quickly seems to be an

```
22-cr-0313-RM          Sentencing          04/29/2024   93
```

1    impulsive decision.  You would think that a person would

2    instead, after obtaining this job --

3         THE COURT:  If he's comfortable his supervisor is in

4    his corner and is going to help him get it back, and, in fact,

5    did, it seems pretty okay, logical.

6         MR. KRAUT:  That was not clear to Mr. Dalke or anyone

7    at the time that he left.  His understanding was that he was

8    going to have to reapply, and there was no guarantee of a spot

9    waiting for him.

10        THE COURT:  Look, make of it what you will.  He left.

11   But he also applied to come back, accepted that -- was offered

12   that job.  In fact, when he was not offered the job, when he

13   was rejected, knew enough to call his supervisor to get him to

14   help, and his supervisor did, and he got the job offer back.

15   And the next day, the next day -- I believe it's the next day

16   -- he's selling top secret documents to those he believes to

17   be Russian and having told them, Tell me what you want, I'll

18   see if I can get it for you.

19        MR. KRAUT:  Our position --

20        THE COURT:  That's not impulse.  That's brazen

21   betrayal.

22        MR. KRAUT:  And a crime that happens over a

23   three-month period I don't think can fairly be called in its

24   entirety impulsive, because that much time passes, so I hear

25   what the Court is saying, but I also think there's an aspect

22-cr-0313-RM          Sentencing          04/29/2024    94

1    to Mr. Dalke's decision-making along the way here that isn't

2    as clear cut as the Government or the Court seems to think.  I

3    don't think he walked in there with this being the grand plan.

4    I'll work for three weeks, get some information, disappear for

5    nine months.  I'm sure they'll hire me back after that, and

6    then I'll keep being a spy.  I just don't think that that's a

7    realistic --

8              THE COURT:  Interestingly, as it develops, about the

9    only part of it that's maybe impulsive is maybe he decides to

10   leave, but he does kind of work out a way to get his salary

11   back, doesn't he?

12             MR. KRAUT:  Well, that's what the Government has been

13   arguing.

14             THE COURT:  Well, that's kind of coincidental that

15   the amount that he demands from the Russians is basically

16   within $200 of his annual salary at NSA.

17             MR. KRAUT:  I know that the guidelines are important

18   for the Court in every case and in this case.

19             THE COURT:  They are as important in every case as

20   they are in this case, which is I look at them.  I consider

21   them.  And if I consider them to be too high, too low, I

22   ignore them.

23             MR. KRAUT:  In requesting a variance, there are some

24   cases that suggest it can be beneficial to tie the variance to

25   certain guideline ranges, and so I want to just let the Court

                     Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    95

1    know how we arrived to 168 months in looking at the guideline

2    chart, and it's relatively simple.  If we start at 41 and I,

3    which is the bottom of the range of 324 months, we take two

4    levels down from the 5K2.0.

5             As we see it, another two levels for zero-point

6    offender to which he is not entitled, but can be compensated

7    for by variance, and then another two levels because no actual

8    damage occurred.  That is essentially it.  And with the

9    six-level variance, or variance equivalent to six levels, we

10   land at 168 months as the bottom of the resulting guideline,

11   which would be offense level 35 and Criminal History Category

12   I.  So we didn't pull that number out of the air.

13            THE COURT:  No, I know.

14            MR. KRAUT:  That's how we got there.  I thought it

15   was important to let the Court know that.  I also think that

16   all three of those considerations have merit.  The

17   cooperation, the fact that he's a zero-point offender, and the

18   fact that no actual damage occurred, even setting aside our

19   hours-long debate about what his trauma history means, what's

20   in his brain or what's not in his brain, all the other things

21   we discussed, even setting aside all of that, those three

22   aspects of the case we believe warrant some mitigation,

23   constitute some mitigation, and assigning just two levels to

24   each of them lands us at 168 months, which I just want to

25   conclude by saying, again, is an extraordinarily harsh

                        Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   96

1    sentence for anyone, especially the time that Mr. Dalke is

2    going to do and the way he's going to do it is exceedingly

3    punitive.

4           We are asking, of course, for the five-year

5    supervised release to supervise him when he gets out.  His

6    future is uncertain.  It's hard to say what that will hold,

7    but I believe at that time, no matter how much time he gets in

8    prison, he will not pose a danger to the country in the

9    future.

10          THE COURT:  Mr. Dalke, if you would please join

11   Mr. Kraut at the podium.  Sir, let me tell you some things

12   that I have told you earlier, but I repeat them now.  Number

13   one, this is your opportunity to address the Court if you wish

14   to.  You're under no obligation to say anything.  If you

15   choose to speak, I will consider it in deciding what is the

16   appropriate sentence in this case.  In terms of speaking, if

17   you choose to speak, you're under no obligation as to what you

18   must address.  You can speak to whatever you want to and

19   ignore whatever you don't want to speak about.

20          Finally -- two final things.  Number one, if there's

21   a slip of the tongue, don't worry about it.  I'm a big boy,

22   and I'm not going to penalize someone for a slip of the

23   tongue, and it's not worth worrying about when you're trying

24   to gather your thoughts and express yourself.  Number two,

25   although I can be, let's say, prickly with counsel and push

22-cr-0313-RM          Sentencing          04/29/2024    97

1   back from time to time, I have no intention of pushing back or

2   quizzing or cross-examining you.  The floor is yours, and you

3   are free to make whatever statement you wish to make.  It will

4   be uninterrupted and unchallenged.

5        THE DEFENDANT:  Thank you, Your Honor.  Your Honor, I

6   come before the Court remorseful and ashamed, found guilty of

7   the crime with which I've been charged.  There are layers to

8   what happened, but I will do my best to succinctly explain.

9   In my youth, I was sexually exploited and assaulted.  I also

10  grew up in a household characterized by domestic violence and

11  substance abuse.  These factors, along with some others, led

12  to me being suicidal at a young age as I was desperate for an

13  escape from the physical and emotional pain I experienced on a

14  daily basis.  I suffered in silence while wearing a smile and

15  compartmentalized my traumas rather than deal with them.  I

16  didn't know how to ask for help or who to ask for it from.  I

17  just felt broken.

18       I've come to understand that I've long suffered from

19  post-traumatic stress disorder, bipolar/manic depression,

20  anxiety, obsessive compulsive disorder, and impulsive control

21  disorder.  My issues have been further compounded by multiple

22  traumatic brain injuries.  To overcome numbness I would often

23  engage in thrill-seeking behavior such as jumping off our roof

24  onto my trampoline.  I often found I didn't just enjoy the

25  adrenaline rush, but the relief that came after it as well.

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM                 Sentencing              04/29/2024    98

1          My other methods of coping included turning to books,

2     games, and TV shows.  It was through these outlets that I

3     became enamored with spies and special operations forces.

4     There is something about the making order out of chaos that

5     appealed to me, and I began trying to emulate them.  As a kid

6     I would put on camouflage and hide in the bushes with a pellet

7     gun as I waited for my mom to come home so I could jump out

8     and scare her or I'd rappel down a rope out of our attic.

9          Returning to my suicide, it is important to note that

10    I've had a number of friends take their lives or otherwise die

11    untimely deaths.  In fact, my first friend killed herself when

12    I was on my way to see her, and I saw the aftermath of her

13    efforts.  She was struggling with the fact that she had been

14    raped by a coworker and became pregnant.  I had offered to

15    co-parent if she decided against having an abortion, and as a

16    result, I often wonder how different my life would be if I had

17    gotten there sooner.  It's something that haunts me

18    frequently.

19         In the book *To Heaven and Back*, a pastor named Father

20    Ubald observes that, While sadness reflects love, despair

21    reflects the destruction of the soul that often accompanies

22    grief.  I have genuinely felt this despair.  Since the most

23    recent suicide of a friend, I began to socially withdraw in

24    fear of additional deaths and my emotional scars being torn

25    open yet again.  It also had another effect.  I began

                        Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM          Sentencing          04/29/2024    99
```

1    self-sabotaging in the midst of my manic depressive episodes,

2    such as deleting major papers right before they were due to be

3    turned in.  I would do things like list impulsively any time

4    things were going good in my life.

5          A variety of factors to include additional untimely

6    deaths led to something again going wrong in my brain.  A

7    voice inside me was telling me that I was unworthy of

8    happiness or success.  Between buying a home, finishing my

9    master's degree, and being accepted into a doctoral program

10   and landing my dream job at NSA with the prospect of new

11   friends and having kids soon, my inner turmoil resurfaced.

12         The voice in my head was reminding me that I should

13   be dead and didn't deserve any of the good fortune in my life.

14   Part of it was that one of my coworkers reminded me a great

15   deal of my first friend that killed herself.  The other was

16   that I had survivor's guilt from my own failed suicide

17   attempts.  I began making terrible decisions not just for the

18   thrill it provided, but, again, for the relief that I would

19   get afterwards from not getting caught.  It was the only thing

20   that made me feel okay even for a short time.

21         That relief was addicting and forced me to keep

22   going, even when I believed that I may have been communicating

23   with law enforcement.  It felt like there was no way to stop

24   it and that I had to see my actions through.  Even when I was

25   arrested at Union Station, I got the wave of relief as I was

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing            04/29/2024    100

1    taken to the ground and thought to myself, It's over.  The

2    alternative in my mind was suicide or suicide by cop.

3          My actions were neither ideologically nor

4    economically motivated.  Rather, the product of terrible

5    judgment in the midst of a great deal of mental anguish.  I

6    made statements while playing a role that are not indicative

7    of my true beliefs, ideas, or desires.  They have cost me

8    literally everything, from my wife and best friend, each of my

9    other friends, to my home, dog, and anything else I cared

10   about.  Still I'm eternally grateful that I only transmitted

11   information to the FBI.

12         I have tried to use my time in solitary confinement

13   constructively reading books about trauma and working on

14   myself.  I've never shared a lot of this information before,

15   but my past is a huge part of what led to my offense.  As part

16   of my growth, I've become a born-again Christian.  In the

17   Bible the Apostle Paul remarks in Philippians chapter 3, verse

18   13 that he focuses on forgetting what is behind and reaching

19   out to what will be.  I'm looking forward to my future as I

20   continue to reconcile my traumas.

21         An additional area of personal growth is my

22   relationship with the truth.  I was not consistently truthful

23   for a variety of reasons, but I understand that I can't be

24   like that.  Each lie built upon another and soon snowballed

25   out of control.  I am now dedicated to being honest with

                     Sarah K. Mitchell, RPR, CRR

```
22-cr-0313-RM           Sentencing          04/29/2024   101
```

 1   myself and others.  I'm additionally committed to developing

 2   healthy coping mechanisms and stopping detrimental thought

 3   processes as I recognize them creeping up.  If I'm able to

 4   keep my suicidal ideation at bay and survive my continued

 5   confinement, I look forward to the day that I can work with a

 6   trusted mental health professional with the hope that I can

 7   become a more well-adjusted member of society.

 8          I truly love my country and community.  It's

 9   something exemplified by my service as a military medic,

10   volunteer police officer and firefighter, as well as other

11   numerous other volunteer positions.  I now just want to live a

12   simple life with my family while I still can.  I can't begin

13   to express how extremely sorry I am for what I've done, and

14   I'm ready to take responsibility.  Thank you for your time,

15   Your Honor.

16          THE COURT:  All right.  In fashioning a sentence here

17   today I've considered the presentence investigation report.

18   I've considered all matters relating to that report that have

19   been filed by the parties, those filings being both classified

20   and unclassified.  I have reviewed the classified material.  I

21   have reviewed -- I have reviewed the classified material that

22   is the subject matter of each of the six counts, as well as

23   additional classified material that was relevant to my

24   consideration.  I'll just leave it at that.

25          I've considered the statements made here today, both

22-cr-0313-RM               Sentencing               04/29/2024    102

1   in the classified sentencing hearing, as well as in this

2   hearing.  I've considered the statements of counsel.  I've

3   considered the statement of the defendant.  In short, I've

4   considered everything and spent considerable time making sure

5   that every aspect of this was looked at, including, as I said

6   before, any case, any study.  Any matter that was given to me,

7   I did not just note and move on.  I would review it

8   personally.

9          So I need to make these findings, although I have

10  already done so.  I find that the total offense level is 41,

11  the Criminal History Category is I.  The imprisonment range is

12  324 to 405.  The fine range is 50,000 to $250,000.  The

13  supervised release range is 2 to 5 years as to each count.

14  This punishment -- well, as to each count.  That came out all

15  confused.  The supervised release range is 2 to 5 years as to

16  each count, although all terms of supervised release run

17  together, so ultimately the total, the cumulative is 2 to

18  5 years.

19         I have granted the motion for downward departure that

20  has been filed by the Government, and that brings us down to a

21  guideline range of 262 to 327, a fine range of 50,000 to

22  250,000, the supervised release range remaining the same.

23         Mr. Dalke, what I do is generally it is my practice

24  to explain what sentence it is that I intend to impose and why

25  it is I intend to do it.  I could spend considerably more time

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    103

1   going back and forth and back and forth with things.  You

2   know, yeah, you volunteered in a lot of places, and you lied

3   in a lot of places, and you're not eligible for reinstatement

4   in a lot of places.

5          I stand by what I said earlier, which is I'm in a

6   posture where I'm asked to believe things without support.

7   And what I mean by that is all of these suicide attempts, and

8   seeing this woman commit suicide and finding her in the park,

9   and then thinking about suicide again, and I've got nothing to

10  back it up other than your word, and your word is worth

11  nothing.

12         You have consistently exaggerated -- through

13  employment, through resumes, throughout your life -- your

14  achievements, your value, your worth.  You were married to a

15  social worker.  And, frankly, if there was a textbook on

16  things to tell a sentencing judge to get a lesser sentence,

17  you hit every single one of them, from sex abuse to difficult

18  family to drugs to mental health, you got it all, and I have

19  proof of very little of it.

20         At the end of the day, I'm going to give you the 262.

21  I'm going to give it to you for a simple reason.  I have

22  looked at all of this that has been given to me.  I've looked

23  at and considered all of the sentencing factors that I have to

24  consider.  The only reason I'm giving you 262 is because

25  that's what the Government is requesting.  I have no problem

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024    104

1    valuing this as more.  This was blatant, it was brazen, and in

2    my mind, it was deliberate, it was a betrayal, and it was as

3    close to treason as you can get.

4            262 is mercy and mitigation, because I can give you a

5    whole lot more and not regret it one bit, but I won't.  The

6    Government has requested 262.  They've done so because of the

7    value of your cooperation, and I acknowledge that, and they're

8    in a position to value that more than I do.  Do I give 226

9    because it's a guideline range?  No.  It ends up being the

10   bottom of the guideline range.  Do I care about that?  No.

11   14 years.  Not only no, hell no.  You earned every bit of 262,

12   and that's what I'm going to do.

13           Any further record?

14           MS. MARTINEZ:  The only record I would make is that

15   I'd ask the Court not make a recommendation to the Bureau of

16   Prisons with respect to the facility.

17           THE COURT:  As I have thought about it more, I don't

18   think it's -- I don't think I can.  And more than that, I've

19   actually been to ADX.  He hasn't.  And I don't think he knows

20   what he's asking for.

21           MS. MARTINEZ:  Thank you, Your Honor.

22           MR. KRAUT:  If I can have just one moment, Your

23   Honor?  Nothing further.  Thank you, Your Honor.

24           THE COURT:  Pursuant to the Sentencing Reform Act of

25   1984, it is the judgment of the Court that the defendant,

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM              Sentencing              04/29/2024    105

1   Jareh Sebastian Dalke, is hereby committed to the custody of

2   the Bureau of Prisons to be imprisoned for a term of

3   262 months as to each of Counts 1 through 6 of the indictment,

4   these sentences to be served concurrently.  Upon release from

5   imprisonment he shall be placed on supervised release for a

6   term of 5 years.  This consists of a 5-year term as to each

7   Counts 1 through 6.  These terms of supervised release are to

8   be served concurrently.

9         Within 72 hours of release from the custody of the

10  Bureau of Prisons, the defendant shall report in person to the

11  probation office in the district to which he is released.

12  While on supervision, you must not commit another federal,

13  state, or local crime, and you must not unlawfully possess a

14  controlled substance.  You must refrain from any unlawful use

15  of a controlled substance.  You must submit to one drug test

16  within 15 days of release from imprisonment and a maximum of

17  20 tests per year of supervision thereafter.

18        You must cooperate in the collection of DNA as

19  directed by the probation officer.  You must comply with the

20  standard conditions adopted by this Court in General Order

21  2020-20.  You must also comply with certain special

22  conditions.  There are seven in number which do not involve a

23  greater deprivation of liberty than reasonably necessary to

24  accomplish the goals of sentencing.  The special conditions

25  are these.

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM            Sentencing          04/29/2024    106

1          One, you must participate in a program of mental

2    health treatment approved by the probation officer and follow

3    the rules and regulations of such program.  The probation

4    officer in consultation with the treatment provider will

5    supervise your participation in the program as to modality,

6    duration, and intensity.  You must pay for the cost of

7    treatment based on your ability to pay.

8          Two, you must participate in a sex-offense specific

9    evaluation and/or treatment program approved by the probation

10   officer.  The probation officer in consultation with the

11   treatment provider will supervise your participation in and

12   compliance with the treatment program.  You must comply with

13   all the rules and regulations of the treatment program.  This

14   may include polygraph and visual response testing as further

15   -- as required participation.  The use of plethysmographs,

16   however, is not authorized.  Further, the Court does not

17   authorize any program which permits program termination based

18   solely on the outcome of polygraphs.  You must pay for the

19   cost of treatment based on your ability to pay.

20         Number three, you must submit your person, property,

21   house, residence, papers, computers, other electronic

22   communication and data storage devices or media or office to a

23   search conducted by a United States probation officer.

24   Failure to submit to such search may be grounds for revocation

25   of release.  You must warn any other occupants that the

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM             Sentencing             04/29/2024      107

1    premises may be subject to search pursuant to this condition.

2    An officer may conduct a search pursuant to this condition

3    only when reasonable suspicion consists and the areas to be

4    searched contained evidence of this violation.  Any search

5    must be conducted at a reasonable time and in a reasonable

6    manner.

7            Four, your use of personally or family owned, leased,

8    or rented computers and Internet-capable devices will be

9    limited to those computers and devices you request in advance

10   to use and which the probation officer authorizes.

11   Authorization of any such computer or device shall be based on

12   the ability of the computer or device to be effectively

13   monitored by monitoring software utilized by the probation

14   office.  You must disclose any user name or identification

15   and/or password for all authorized computers or

16   Internet-capable devices to the probation officer and keep

17   that disclosure complete and up to date.

18           Five, your use of other computers and

19   Internet-capable devices is prohibited except to the extent

20   that such computers or devices need to be accessed, one, for

21   emergencies; two, for completion of routine transactions at

22   commercial health or religious brick-and-mortar

23   establishments; three, for the completion of employment duties

24   and responsibilities; four, for voting and census reporting;

25   or, five, as otherwise approved by the probation officer.  The

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   108

1    probation officer shall approve the use of such other computer

2    or device absent reasonable suspicion that the defendant is

3    using such computer or device to circumvent the monitoring of

4    his personal or family owned, leased, or rented computer

5    device.

6             Six, you must allow the probation officer to install

7    software and/or hardware designed to monitor activities on any

8    personally or family owned, leased, or rented computer or

9    Internet-capable device you are authorized by the probation

10   officer to use.  This monitoring may record any and all

11   activities on the device, including the capture of key

12   strokes, application information, Internet use history, e-mail

13   correspondence, and chat conversations.  You must not attempt

14   to remove, tamper with, reverse engineer, or in any way

15   circumvent the software and/or hardware.  You must pay for the

16   cost of monitoring based on your ability to pay.

17            Number seven, you must refrain from the unauthorized

18   oral or written disclosure of classified information or

19   information relating to the national defense.

20            The defendant shall pay a special assessment of $600,

21   which is $100 per count, which is due and payable immediately.

22   The Court finds that the defendant does not have the ability

23   to pay a fine, so I waive the imposition of a fine in this

24   case.

25            Pursuant to Rule 32.2 of the Federal Rules of

                    Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM          Sentencing          04/29/2024   109

1  Criminal Procedure and as follow-up to the preliminary order

2  of forfeiture previously entered, the defendant must forfeit

3  his interest in certain property to the United States.  That

4  being the money judgment in the sum stated in the motion for

5  preliminary order of forfeiture as approved by the Court, as

6  well as the firearm that was seized.  I don't believe there's

7  any other property that --

8          MS. MARTINEZ:  No.

9          THE COURT:  -- is subject to forfeiture.

10          MS. MARTINEZ:  Criminal forfeiture, no.

11          THE COURT:  Right.  The defendant is advised of his

12  right to appeal the sentence.  If he desires to appeal, a

13  notice of appeal must be filed with the clerk of the court

14  within 14 days after entry of the judgment or the right to

15  appeal will be lost.  If the defendant is unable to afford an

16  attorney for an appeal, the Court will appoint one to

17  represent him.  If the defendant so requests, the clerk of the

18  court must immediately prepare and file a notice of appeal on

19  his behalf.

20          The defendant is in marshal's custody.  He's remanded

21  to the marshal's custody for delivery to the BOP for service

22  of sentence.

23          Is there anything further on this matter on behalf of

24  the Government?

25          MS. MARTINEZ:  No.  Thank you, Your Honor.

Sarah K. Mitchell, RPR, CRR

22-cr-0313-RM                Sentencing              04/29/2024    110

1           THE COURT:  Mr. Kraut?

2           MR. KRAUT:  Nothing further.  Thank you.

3           THE COURT:  Recess.

4           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

5      (The proceedings were concluded at 2:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

1                        REPORTER'S CERTIFICATE

2

3              I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10             Dated this 5th day of July, 2024.

11

12

13

14             _____/s/ Sarah K. Mitchell_____

15                     SARAH K. MITCHELL
                       Official Court Reporter
16              Registered Professional Reporter
                    Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR